2:22cv147 JDL

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

U.S. DISTRICT COURT
DISTRICT OF MAINE
RECEIVED & FILED
2022 MAY 17 P 2:40
DEPUTY CLERK

GREGORY B. SULLIVAN
on behalf of himself and
all those similarly situated,                    ) case no.

Plaintiff,

)  Jury trial requested

vs.

CHESTER WATER AUTHORITY,
JUDGE DOMINIC F. PILEGGI,
EEOC-PHILADELPHIA OFFICE,
     (see attached)

Defendants,

CLASS ACTION COMPLAINT

SHORT CAPTION:

SULLIVAN V. CHESTER WATER AUTHORITY, et al.

Defendants                                    )

CHESTER WATER AUTHORITY,                       )
JUDGE DOMINIC PILEGGI,                          )
EEOC-PHILADELPHIA OFFICE,                       )
ROBYN S. BENNETT,                               )
CROZER CHESTER MEDICAL CENTER,                  )
DR. EDWARD R. STANKIEWICZ, MD,                  )
PARK CARE OCCUPATIONAL HEALTH,                  )
HOSTEN AND ASSOCIATES OF MEDIA, PA,            )
MARK ALAN RAITH,                                )
CITY OF CHESTER, PENNSYLVANIA,                  )
INTERNATIONAL BROTHERHOOD OF                    )
    FIREMEN AND OILERS SEIU                     )
    LOCAL 473,                                  )
HOSPITAL OF THE UNIVERSITY OF                   )
    PENNSYLVANIA,                               )
DELAWARE COUNTY, PENNSYLVANIA,                  )
COMMONWEALTH OF PENNSYLVANIA,                   )
RACHEL DICKINSON, PA-C,                         )
DHHS-MAINE,                                     )
PORTLAND STREET PUBLIC HEALTH                   )
    CENTER,                                     )
MERCY HOSPITAL,                                 )
MERCY PRIMARY CARE,                            )

(OVER)

PORTLAND INTERNAL MEDICINE,  
UNIVERSITY OF SOUTHERN MAINE–  
    PORTLAND,  
RITE-AID,  
7-ELEVEN,  
OPPORTUNITY ALLIANCE,  
MATTINA R. PROCTOR DIABETES  
    CENTER,  
KRISTEN M. ELLENSOHN, APRN FNP,  
DR. KAREN OLSON, MD,  
HANNAFORDS SUPERMARKETS,  
GOVERNOR PAUL LE PAGE,  
BRENDAN JOHNSON,  
JUDGE VICTORIA EVANS,  
DR. JOSEPH R. ROLLAND, PAC,  
DR. JUSTIN B. BENNETT, MD,  
MAINE HEALTH MMP,  
ST. MARY'S,  
MARTINS POINT HEALTH CENTER,  
YMCA OF SOUTHERN MAINE –  
    PORTLAND,  
DR. PETER J. AMEGLIO, MD,  
DR. JAMES A. KATZ, MD,  
EILEEN F. SKINNER,  
PREBLE STREET RESOURCE AND,  
    (over)

DAY CENTER,
MERCY PRIMARY CARE,
NEW ENGLAND FOOT AND ANKLE
    SPECIALISTS,
GREATER PORTLAND TRANSIT DISTRICT,
MAINE MEDICAL CENTER,
PINE TREE LEGAL ASSISTANCE,
PORTLAND POLICE DEPARTMENT,
REGIONAL TRANSPORTATION PROGRAM,
CITY OF PORTLAND, MAINE,
GENERAL ASSISTANCE PROGRAM –
    PORTLAND,
EDDIE BARAJAS,
BIG APPLE,
CVS,
WALGREENS,
WALGREENS,
CLARION HOTEL,
PORTLAND PUBLIC LIBRARY,
MAINE BEHAVIORAL HEALTHCARE,
SAV A LOT,
WHOLE FOODS MARKET,
CUMBERLAND FARMS,
STATE OF MAINE,
THE PHARMACY AT MAINE MEDICAL

(over)

CENTER,
CUMBERLAND COUNTY, MAINE,
MAINE ORTHOPAEDIC,
PORTLAND FIRE DEPARTMENT,
JUDITH A. SULLIVAN,
PORTLAND HOUSING AUTHORITY,
JOE'S SUPER VARIETY STORE,
et al.

# TABLE OF CONTENTS

I. Parties to the Complaint

II A Jurisdiction
   B Diversity
   c Venue

III Amount of Controversy

IV Background and Facts of the Case

(#1) Introduction
(#2) — (#16) Pennsylvania
(#17) — (#20) Portland, ME pre-operation
(#21) — (#26) Operation and Aftercare
(#27) — (#35) General Assistance
(#36) — (#39) Portland Police Department
(#40) — (#55) Portland YMCA
(#56) — (#66) Recent medical problems
(#67) — (#68) Joseph Rolland and Tammy Morse
(#69) — (#72) attempts to adjudicate
(#73) harm to plaintiff and others
(#74) Class Action Allegations
(#76) — (#80) Pennsylvania Fraud Enterprise

—over

1 | V Prayer for Relief
2 |
3 |
4 |
5 |
6 |
7 |
8 |
9 |
10 |
11 |
12 |
13 |
14 |
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |

I   Parties to This Complaint

Plaintiff:

1   GREGORY B. SULLIVAN, Pro Se and all those similarly situated
    70 Forest Ave
    Portland, Cumberland County
    Maine, 04101
    (207) 450-3221

Defendants:

1   CHESTER WATER AUTHORITY (CWA)
    Water Utility, its managers, servants and/or employees
    415 Welsh St
    Chester, Delaware County
    Pennsylvania, 19013
    (610) 876-8181

2   JUDGE DOMINIC F. PILEGGI
    Judge, former Mayor, former PA State Senator
    804 20th St
    Chester, Delaware County
    Pennsylvania, 19013-5510
    delcocourts@co.delaware.pa.us

(over)

3. EEOC-PHILADELPHIA OFFICE

Government agency, its managers, caseworks, servants and/or employees

801 Market St, Suite 1300

Philadelphia, Philadelphia County

Pennsylvania 19107-3126

Phil 800 669 4000 /267 589-9700

E-Mail: PDOContact @eeoc.gov

4 ROBYN S. BENNETT

CWA Assistant Human Resources Director

2005 W. 7th St

Chester, Delaware County

Pennsylvania, 19013

(610) 497-3438

5. CROZER CHESTER MEDICAL CENTER

Hospital, its physicians, servants and/or employees

1 Medical Center Blvd

Upland, Delaware County

Pennsylvania, 19013

(610) 447-2000   1 800 254-3258

6 DR. EDWARD R. STANKIEWICZ, MD

Physician's office, its physicians, servants, and/or employees

1579 Chichester Ave

over

Linwood, Delaware County
Pennsylvania 19061
Ph: (610) 485-5800

7. PARK CARE OCCUPATIONAL HEALTH
Hospital, its physicians, servants and/or employees
1553 Chester Pike, Suite 204
Crum Lynne, Delaware County
Pennsylvania, 19022
Ph: (610) 595-6811

8. HOLSTEN AND ASSOCIATES OF MEDIA, PA
Law office, lawyers, servants and/or employees
1 S. OLIVE ST
Media, Delaware County
Pennsylvania 19063
Ph: (610) 566-8800

9. MARK ALAN RAITH, ESQ.
Lawyer
401 Brighton Ave
Reading, Berks County
Pennsylvania, 19606
Ph: (610) 370-9466  (610) 627-2426

(over)

10. CITY OF CHESTER, PENNSYLVANIA
Municipality, mayors, servants and/or employees
City Hall
1 4th St
Chester, Delaware County
Pennsylvania, 19013
Ph: (610) 447-7700

11. INTERNATIONAL BROTHERHOOD OF FIREMEN AND
OILERS SEIU LOCAL #473
Labor Union, its leadership, members, servants and/or employees
3565 Sepviva St
Philadelphia, Philadelphia County
Pennsylvania, 19134
Ph: (215) 533-8440

12. HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA
Hospital, its physicians, servants and/or employees
3400 Spruce St
Philadelphia, Philadelphia County
Pennsylvania, 19104
Ph: (215) 662-4000

13. DELAWARE COUNTY, PENNSYLVANIA
County government, its council, servants and/or employees
(over)

201 W. Front St
Media, Delaware County
Pennsylvania, 19063
Ph: (610) 891-4000
E-mail: webmaster@ co.delaware.pa.us

14. COMMONWEALTH OF PENNSYLVANIA
State government, its agencies, servants and/or employees
Office of the Governor
508 Main Capitol Building
Harrisburg, Dauphin County
Ph: (717) 787-2500

15. RACHEL DICKINSON, PA-C
Physician's Assistant
1 Crescent Dr, Suite 100
Philadelphia, Philadelphia County
Pennsylvania, 19112
Ph: (215) 952-9900

16. DHHS-MAINE
State government, its agencies, servants and/or employees
109 Capitol St
Augusta, Kennebec County
Maine, 04330
(over)

Ph: (207) 287-3707

17. PORTLAND STREET PUBLIC HEALTH CENTER
Clinic, its physicians, servants and/or employees
20 Portland St
Portland, Cumberland County
Maine, 04101
Ph: (207) 874-8445

18. MERCY HOSPITAL
Hospital, its physicians, affiliates, servants and/or employees
175 Fore River Parkway
Portland, Cumberland County
Maine, 04102
Ph: (207) 879-3000

19. MERCY PRIMARY CARE
Clinic, its providers, physicians, servants and/or employees
175 Fore River Parkway
Portland, Cumberland County
Maine, 04101
Ph: (207) 879-3000

20. PORTLAND INTERNAL MEDICINE
Clinic, its providers, physicians, servants and/or employees
(over)

43 Baxter Blvd
Portland, Cumberland County
Maine, 04101
Ph: (207) 771-1717

21. UNIVERSITY OF SOUTHERN MAINE LIBRARY
Library, its staff, servant and/or employees
314 Forest Ave
Portland, Cumberland County
Maine, 04101
Ph: (207) 780-4270

22. RITE-AID
Pharmacy, its pharmacists, staff, servants and/or employees
713 Congress St
Portland, Cumberland County
Maine, 04101
Ph: (207) 774-8456

23. 7-ELEVEN
Convenience store, its servants and/or employees
704 Congress St
Portland, Cumberland County
Maine, 04101
Ph: (207) 871-1483

(over)

24. OPPORTUNITY ALLIANCE
    Support program, its managers, servants, physicians and/or employees
    190 Lancaster St, Suite 310
    Portland, Cumberland County
    Maine, 04101
    Ph: (207) 874-1175

25. MATTINA R. PROCTOR DIABETES CENTER
    Diabetes clinic, its physicians, servants and/or employees
    144 State St
    Portland, Cumberland County
    Maine, 04101
    Ph: (207) 400-8500

26. KRISTEN M. ELLENSOHN, APRN FNP
    Diabetes physician
    144 State St
    Portland, Cumberland County
    Maine, 04101
    Ph: (207) 400-8500

27. DR. KAREN L. OLSON, MD
    Physician
    42 Flintlock St
    Cumberland, Cumberland County
    (over)

Maine, 04021
Ph: (207) 829-6011

28. HANNAFORD SUPERMARKET
Supermarket, its pharmacy, servants and/or employees
295 Forest Ave
Portland, Cumberland County
Maine, 04101
Ph: (207) 761-5965

29. GOVERNOR PAUL LE PAGE
Former Maine Governor
1 State House Station
Augusta, Kennebec County
Maine, 04333
Ph: (207) 287-3531

30. BRENDAN JOHNSON
Personal capacity
506 Main St
Lewiston, Androscoggin County
Maine, 04240
Ph: (207) 782-2121

31. JUDGE VICKIE EVANS
(over)

Judge ODAR
One Portland Square Suite 600
Portland, Cumberland County
Maine, 04101
Ph: (877) 701-2137

32. DR. JOSEPH R. ROLLAND, PA-C
Personal capacity
175 Fore River Parkway
Portland, Cumberland County
Maine, 04101
Ph: (207) 879-3000

33. DR. JUSTIN B. BENNETT, MD
Personal Capacity
123 Medical Center Dr
Brunswick, Cumberland
Maine, 04011
Ph: (207) 373-6800

34. MAINE HEALTH MMP
Primary Care facility, its physicians, servants and/or employees
22 Bramhall St
Portland, Cumberland County
Maine, 04102

(over)

Ph: (207) 662-0111

35. ST. MARY'S HOSPITAL
Hospital, its physicians, servants and/or employees
15 Mollison Way
Lewiston, Androscoggin
Maine, 04240-5805
Ph: (207) 777-4440

36. MARTIN'S POINT HEALTH CARE
Health care facility, its physicians, servants and/or employees
331 Veranda St
Portland, Cumberland County
Maine, 04103-5544
Ph: (207) 828-2402

37. YMCA OF SOUTHERN MAINE - PORTLAND
Residential program, its directors, staff, residents and/or employee
217 High St
Portland, Cumberland County
Maine, 04101
Ph: (207) 874-1111

38. DR. PETER J. AMEGLIO, MD
Personal capacity
(over)

6839 Porto Fino Circle
Fort Myers, Lee County
Florida, 33912
Ph: (239) 990-8138

39. DR. JAMES A. KATZ, MD
Personal capacity
43 Baxter Blvd
Portland, Cumberland County
Maine, 04101
Ph: (207) 771-1717   (207) 879-3040

40. EILEEN F. SKINNER
Personal capacity
51 Blossom ST
Boston, Suffolk County
Massachusetts, 02114
Ph: (617) 722-3000

41. PREBLE STREET RESOURCE CENTER DAY SHELTER
Resource center, its affiliates, servants and/or employees
5 Portland St
Portland, Cumberland County
Maine, 04101
Ph: (207) 775-0026
(over)

42. NEW ENGLAND FOOT AND ANKLE SPECIALISTS
    Medical facility, its physicians, servants and/or employees
    117 Auburn St
    Portland, Cumberland County
    Maine, 04103
    Ph: (207) 797-4791

43. GREATER PORTLAND TRANSIT DISTRICT
    Transportation Service, its servants and/or employees
    114 Valley St
    Portland, Cumberland County
    Maine, 04102
    Ph: (207) 774-0351

44. MAINE MEDICAL CENTER
    Hospital, its affiliates, physicians, servants and/or employees
    22 Bramhall St
    Portland, Cumberland County
    Maine, 04102
    Ph: (207) 662-0111

45. PINE TREE LEGAL ASSISTANCE INC.
    Legal aid facility, its, lawyers, servants and/or employees
    88 Federal St
    Portland, Cumberland County
                        (over)

Maine, 04101
Ph: (207) 774-8211

46. PORTLAND POLICE DEPARTMENT
Police department, its officers, servants and/or employees
109 Middle St
Portland, Cumberland County
Maine, 04101
Ph: (207) 874-8479

47. REGIONAL TRANSPORTATION PROGRAM
Transportation service, its drivers, servants and/or employees
127 ST. JOHN St
Portland, Cumberland County
Maine, 04102
Ph: (207) 774-2666

48. CITY OF PORTLAND, MAINE
City government, its departments, agencies, servants and/or employee
389 Congress St
Portland, Cumberland County
Maine, 04101
Ph: (207) 874-8300

49. GENERAL ASSISTANCE PROGRAM-PORTLAND

over

Assistance program, its financial eligibility specialists, and/or employee
389 Congress St #308
Portland, Cumberland County
Maine, 04101
Ph: (207) 874-8633

50. EDDIE BARAJAS
Personal capacity
100 Waterman Dr, Suite 101
South Portland, Cumberland County
Maine, 04106
Ph: (207) 773-4140

51. BIG APPLE
Convenience store, its servants and/or employees
2 Park Ave
Portland, Cumberland County
Maine, 04101
Ph: (207) 773-7909

52. CVS
Pharmacy, its servants, and/or employees
510 Congress St
Portland, Cumberland County
Maine, 04101

(over)

Ph: (207) 773-7909

53. WALGREENS
Pharmacy, its servants and/or employees
290 Congress St
Portland, Cumberland County
Maine, 04101
Ph: (207) 774-0344

54. WALGREENS
Pharmacy, its servants and/or employees
127 Marginal Way
Portland, Cumberland County
Maine, 04101
Ph: (207) 771-5631

55. CLARION HOTEL
Hotel, its managers, servants and/or employees
1230 Congress St
Portland, Cumberland County
Maine, 04101
Ph: (207) 774-5611

56. PORTLAND PUBLIC LIBRARY
Libray, its security guards, staff, servants, and/or employees
(over)

5 Monument Square
Portland, Cumberland County
Maine, 04101
Ph:(207) 871-1700

57. MAINE BEHAVIORAL HEALTHCARE
Counseling center, its counseling staff, servants and/or employees
165 Lancaster St
Portland, Cumberland County
Maine., 04101
Ph: (207) 874-1030

58. SAV A LOT
Supermarket, its servants and/or employees
268 St John ST
Portland, Cumberland County
Maine, 04101
Ph: (207) 772-0622

59. WHOLE FOODS MARKET
Supermarket, its servants and/or employees
2 Somerset St
Portland, Cumberland County
Maine, 04101
Ph: (207) 774-7711

(over)

60. CUMBERLAND FARMS
    Convenience store, its servants and/or employees
    49 Pine St
    Portland, Cumberland County
    Maine, 04101
    Ph: (207) 874-9528

61. STATE OF MAINE
    State government, its departments, servants and/or employees
    68 State House Station # 200
    Augusta, Kennebec County
    Maine, 04333
    Ph: (207) 287-3531

62. THE PHARMACY AT MAINE MEDICAL CENTER
    Pharmacy, its servants and/or employees
    22 Bramhall St
    Portland, Cumberland County
    Maine, 04102
    Ph: (207) 662-2626

63. CUMBERLAND COUNTY, MAINE
    County government, its agencies, servants and/or employees
    142 Federal St
    Portland, Cumberland County
    (over)

Maine, 04101
Ph: (207) 871-8380

64. MAINE ORTHOPAEDIC
Orthopaedic clinic, its physicians, and/or employees
1601 Congress St
Portland, Cumberland County
Maine, 04101
Ph: (207) 774-0342

65. PORTLAND FIRE DEPARTMENT
Fire department, EMS, servants and/or employees
380 Congress ST
Portland, Cumberland County
Maine, 04101
Ph: (207) 874-8400

66. JUDITH A. SULLIVAN
Personal Capacity, sister
1865 E Broadway Rd Apt 1005
Tempe, Maricopa County
Arizona, 85282
Ph: (623) 388-4891 (708) 535-9145

67. PORTLAND HOUSING AUTHORITY
—OVER—

Housing authority, its administrators, and/or employees
14 Baxter Blvd
Portland, Cumberland County
Maine, 04101
Ph: (207) 773-4753

68. JOE'S SUPER VARIETY STORE
665 Congress St
Portland, Cumberland County
Maine, 04101
Ph: (207) 773-36556

## IIA    Jurisdiction and Venue

1. This action arises under the laws of the United States, in particular, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Civil RICO 18 U.S.C. § 1962 (c)(D); 18 U.S.C. § 1961 et seq.; 18 U.S.C. § 371; CRA Titles VI, VII and VIII; the Americans with Disabilities Act Titles I and II; 25 CFR § 11.406 (a) (3); 42 U.S.C. § 1981 and 42 U.S.C. § 1983. Accordingly, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331; 18 U.S.C. § 1964; 18 U.S.C. § 1961 et seq.; and 42 U.S.C. §§ 2000e-5, 2000e-2, 2000e-3, and 2000e-16.

2. This Court has supplemental jurisdiction pursuant to Maine State Laws: Title 17-A § 905-C; Title 22 sec 4450: Chapter 13 concerning "Back Bills"; Title 17-A 353 (1)(A); Title 17-A 355 (1)(2) (A+B); 5 MRSA § 4582; and 14 MRSA § 753 as those claims are so closely related to the federal claims in this action that they form part of the same case or controversy.

II B Diversity of Citizenship

1 The Plaintiff

a. The plaintiff, GREGORY B. SULLIVAN, is a citizen of the State of Maine.

The Defendant (s)

a. The defendant, CHESTER WATER AUTHORITY, is incorporated under the laws of the State of Pennsylvani and has its principal place of business in the State of Pennsylvania.

b. The defendant, JUDGE DOMINIC F. PILEGGI, is a citizen of the State of Pennsylvania.

c. The defendant, ROBYN S. BENNETT, is a citizen of the State of Pennsylvania.

d. The defendant, CROZER CHESTER MEDICAL CENTER, is incorporated under the laws of the State of Pennsylvania, and has its principal place of business in the State of Pennsylvania.

— over —

e. The defendant, DR. EDWARD R. STANKIEWICZ, MD; is incorporated in the State of Pennsylvania and has its principal place of business in the State of Pennsylvania

f. The defendant, PARK CARE OCCUPATIONAL HEALTH, is incorporated in the State of Pennsylvania, and has its principal place of business in the State of Pennsylvania

g. The defendant, HOLSTEN AND ASSOCIATES OF MEDIA PA, is incorporated in the State of Pennsylvania, and has its principal place of business in the State of Pennsylvania.

h. The defendant, MARK ALAN RAITH, is a citizen of the State of Pennsylvania.

i. The defendant, CITY OF CHESTER, PENNSYLVANIA, is incorporated in the State of Pennsylvania, and has its principal place of business in the State of Pennsylvania.

j. The defendant, INTERNATIONAL BROTHERHOOD OF FIREMEN AND OILERS SEIU LOCAL 473, is incorporated in the State of Pennsylvania and has

—over—

its principal place of business in the State of
Pennsylvania.

k. The defendant, HOSPITAL OF THE UNIVERSITY OF
PENNSYLVANIA, is incorporated in the State of
Pennsylvania, and has its principal place of business
in the State of Pennsylvania.

l. The defendant, DELAWARE COUNTY, PENNSYLVANIA,
is incorporated in the State of Pennsylvania, and has
its principal place of business in the State of Pennsylvani[a]

m. The defendant, COMMONWEALTH OF PENNSYLVANIA
is incorporated in the State of Pennsylvania and has its
principal place of business in the State of Pennsylvania

n. The defendant, RACHEL DICKENSON, PA-C, is a
citizen of the State of Pennsylvania.

o. The defendant, JUDITH ANN SULLIVAN, is a
citizen of the State of Arizona.

C    Venue is proper in this District pursuant to 18 U.S.C. § 1965 et seq.; and 28 U.S.C. § 1391 et seq.; in that a sub-stantial amount of the many defendants in this action either reside or do business in this District, and many of the events in this action occurred in this Dis-trict. Though continuity of these actions span a time when Plaintiff lived in Pennsylvania until March of 2010; Plaintiff has resided in this District for well over ten (10) years.

Any change of venue to a different District for whatever reason, would cause such economic hard-ship, and physical and emotional distress to plaintiff that this case could not be litigated and would utterly negate the pursuit of justice.

III    The amount of controversy in this action well exceeds the statutory sum of $75,000.

1 PRAYER FOR RELIEF
2
3       I have gone through so much over the last
4 23 years through the process described in this lawsuit.
5 I have lost:
6       a) my job;
7       b) my house;
8       c) my savings;
9       d) my health;
10      e) my relationships;
11      f) my inheritance from my mother's estate,
12      I am asking for the return to my job as I was
13 unfairly terminated while on medical leave.
14      I am asking for all back pay to include: the average
15 amount of overtime for my department; all cost of living
16 adjustments and full benefits.
17      I am seeking the value of the property that I
18 lost at 6727 Harley St Philadelphia Pa 19142.
19      The Inheritance left to me by my mother or the value
20 thereof including: the houses at 100 E 24th St Chester Pa
21 19013, 23 E. 18th St Chester Pa 19013; and 806 W. 11th ST
22 Chester, Pa 19013.
23      I am also asking punitive damages for the pain and
24 suffering, the medical maiming, the emotional strain and
25 the continuing medical problems that I've incurred which
26                  —over—

1 may last a long time.
2  I am also attempting to place a value on the one
3 thing that I can't get back — the loss of twenty three
4 years of which should have been the best in my life!
5 I'm asking for $20M dollors for every lost year for a total
6 of $460 million.
7
8                    Thank You
9                    God Bless
10                   Gregory Brian Sullivan
11                   Gregory Brian Sullivan
12
13 ✓ Certification and Closing
14
15          Date of signing March 17, 2022
16
17      Signature      Gregory Brian Sullivan
18      Printed        Gregory Brian Sullivan
19
20
21
22
23
24
25
26

IV

1  (#1)  I, plaintiff Gregory Brian Sullivan, am a sixty year
2  old African-American male currently residing in Portland,
3  Maine. In the year 2000, while living in Chester, Penn-
4  sylvania, I filed a complaint with the Philadelphia of-
5  ice of the Equal Employment Opportunities Commisio
6  (EEOC) against both my employer Chester Water Auth-
7  ority (CWA); and my union, the International Broth-
8  erhood of Firemen and Oilers Local 473 SIEU of Phila-
9  delphia, Pennsylvania; for racial harassment and discr-
10 imination.
11      The filing of that complaint started a bizarre
12 chain of events taking place in two states, involving
13 two separate criminal enterprises and lasting more
14 than two decades; the consequences of which have cos
15 me everything.
16
17 (#2) In the spring of 1999 I applied for a job as a
18 summer hire with Chester Water Authority and though
19 I failed the hearing portion of the physical exam, I
20 was hired anyway since it was only grass-cutting. A
21 the end of the assignment I was considered for a full
22 time position a sent back to Crozer-Chester Medical Cent
23 Occupation Health for another physical. I again failed
24 the hearing test.
25      Concerned about my prospects of being hired,
26              — over —

1  I called the office of then-Chester Mayor Dominic Pil-
2  eggi and was told "you'd better go back and pass that
3  test!" I went back and tried several times but always
4  failed. However, on December 22, 1999; just three days
5  before Christmas, I was "passed"; but without the dist-
6  inction of being hearing impaired.

7

8  (#3)   On January 9, 2000 I began working for CWA an
9  was assigned to a construction crew. The loud noise
10  caused by heavy equipment, jack hammers and drills;
11  created foreseeable problems and my hearing very quickly
12  became an issue. Soon I was being taunted; the tauntin
13  then turned into harassment; the harassment then becar
14  racial. This then became toxic even though my foreman,
15  Terry Nacrelli, was the shop steward for the union.
16         After speaking to my supervisor, the manager of
17  the construction division and a human resources mar
18  ager; I again called the office of then-Mayor Pileggi
19  For this I was suspended by CWA which prompted the
20  aforementioned (#1, line 4) EEOC complaint filed in the
21  year 2000.

22

23  (#4)   Upon receiving my complaint the EEOC casewor
24  er assigned to me, Elizabeth Wjasow, assured me that
25  it would be an easy case. No problem. You don't need a
26                    —over—

1  lawyer. She then issued two directives: first, drop the uni
2  from your complaint; the union can't be sued because
3  you work for a municipality; and secondly, rewrite your
4  complaint omitting Mr. Pileggi's name because that make
5  it political and politics are not allowed at the EEOC.
6      I would later find out that Dominic Pileggi had de
7  signs on running for State Senate; which he did and h
8  won.
9
10  (#5)  That initial complaint was settled through med
11  iation in 2001. In 2001 I was given a raise and sent t
12  a new department as a meter serviceman; a promotion
13  I was elated, having been told at that time that I
14  would have no problems from CWA because the EEOC
15  does not tolerate retaliation. That was not the case.
16
17  (#6)   In both 2003 and 2005 I again filed complaints
18  against CWA with the EEOC. for harassment and retalia
19  ion. Those complaints were handled by a different case-
20  worker; Diana Schley. Ms. Schley at all times was comba
21  ive, indifferent, and always seemed to be advocating
22  for CWA. Both cases were dismissed for no cause.
23
24  (#7)  In 2007 things changed. On May 22, 2007 I was
25  involved in a workplace accident in which I suffered
26              — over —

1 several different injuries. One of these was to my right
2 great toe which was actually a reinjury of a problem that
3 had occurred in 2003. I was not permitted access to
4 proper medical care by the company or its occupational
5 health care providers. CWA had a pattern of conspiring
6 with health care providers in order to minimize the in-
7 juries and illnesses of African-American employees
8 while allowing white employees full benefits.
9      In July of 2007 I again filed a charge with the
10 EEOC against CWA; this time for racial discrimination
11 and retaliation. This charge was picked up by the EEOC
12 and was also handled by Ms. Schley.
13      A few weeks after filing this charge I was threatened
14 by a friend of my supervisor, Kim Koterbo, while on a
15 service call. I felt extremely intimidated and soon drop-
16 ped the charge. Not long after, I was approached pri-
17 vately by Assistant Human Resources Manager (CWA)
18 Robyn Bennett (African-American, female) and queried as
19 to why I dropped the complaint. She explained to me
20 that it was the third time in which an African-Amer-
21 ican employee had filed for the same cause, and thus
22 it would prompt an automatic investigation of the
23 company. She added that she was telling me this be-
24 cause she too was being discriminated against!
25
26                    — over—

1   (#8)   In November of 2007 I refiled the charge from
2   July of 2007 (#7, line 9). This time, though the charge
3   was filed in November of 2007, Ms. Schley assigned a
4   2008 charge number to it (530-2008-00072) and then
5   stalled the case into March of that year, at which time
6   I was coerced into another mediation hearing with CW.
7
8   (#9)   By the time of the mediation hearing Dominic
9   Pileggi had not only won a State Senate seat (see #4, line 7)
10  but had become one of the most powerful politicians in
11  the state of Pennsylvania. Everyone who had legal expos-
12  ure in this complaint had a vested interest in preventing
13  an investigation; including State Senator Pileggi.
14          An investigation would have shown:
15          a) a conspiracy between CWA, its doctors and the union
16          b) Title VII violations;
17          c) violations of the Americans with Disabilities Act
18          d) insurance fraud; and
19          e) possible culpability in the premature death of
20  fellow claimant Woody Wise.
21          An investigation would have also shined a light on
22  one of the longest-running criminal enterprises in the
23  United States — the Delaware County Criminal Enterprise
24  the goal of which is to exploit the predominantly poor,
25  predominantly African-American city of Chester, Penn-
26                          —over—

1  sylvania, for political and economic gain.
2
3  (#10)     On March 18, 2008, as Barack Obama was giving his
4  Speech on Race in Philadelphia, my mediation hearing took
5  place just a few blocks away. In attendance were Robyn
6  Bennett, Assistant Human Resources Manager (CWA); Solic-
7  itor Francis J. Catania, sr. (CWA); the mediator, and myself.
8  The meeting was contentious and, therefore, no conciliation
9  was reached. I again had to reach out to the EEOC and
10  Ms. Schley.
11
12  (#11)     At the time of the mediation hearing I was out on
13  medical leave unable to work. As previously stated the pro-
14  blem with my right great toe began in 2003 (#7, line 3). At
15  that time I saw Dr. David N. Bosacco M.D. at Riddle Mem-
16  orial Hospital. At the doctor's request images of my toe
17  were taken and I was told nothing was wrong. I went
18  back to work and continued on through moderate pain.
19  This was the first in a pattern of physicians who refused
20  to acknowledge the damage to my toe.
21        On May 22, 2007, the day of the workplace injury
22  which was the basis for the EEOC complaint (#7, lines
23  2,9); I went to the Crozer-Chester Medical Center where
24  images were again taken of the same toe. The next two
25  days, May 23rd and 24th, I saw Rachel Dickenson, Pa-C;
26                    —over—

1  of Crozer Keystone Center for Occupational Health; who
2  while mocking me for my obvious limp, listed my injury
3  on medical forms as left toe contusion on one day and
4  right toe contusion on the next. My personal care physician
5  Dr. Edward R. Stankiewicz M.D.; while refusing to ack-
6  nowledge the injury to my toe on paper but knowing
7  that I was in immense pain, chose to write me prescript-
8  ions for oxycodone but listed them in my records (with
9  a wink and a nod) as being for lower back pain (which I
10  do have).
11        The pain was so bad and the injury so severe that
12  several times a day I had to remove my shoe and man-
13  ually reset the bone in my toe!
14
15  (#12)  Also, from 1999 until the time the mediation hear-
16  ing of March 18, 2008; I had continuously faced discrim-
17  ination due to my hearing disability (#2, lines 5,6); was
18  marginalized and racially harassed because of it (#3, line
19  12-14); and faced retaliation and harassment (#6, lines 17,
20  18) resulting in my filing of subsequent EEOC complaint
21        The harassment that I faced during this time be-
22  came intense to the point of being systematic. I woul
23  later find that it was in the form of the COINTELPRO
24  (counter intelligence program) which was first discov-
25  ered (not coincidentally) in the Delaware County bur
26                — over —

1 ough of Media, Pennsylvania in 1971. This harassment,
2 stalking and monitoring not only involved employees
3 of CWA, but people in the community (#7, lines 13-15),
4 and even family members.
5        Due to the high-profile names associated with
6 my case; including: State Senator Dominic Pileggi (#
7 lines 6-8); Terry Nacrelli, who was not only my Chief
8 Shop Steward (#3, lines 13,14) but also the son of former
9 Chester Mayor John T. Nacrelli; and CWA supervisor Thom
10 as A. Zetusky (not mentioned heretofore), son of former
11 President Judge Edward J. Zetusky of Delaware County; an
12 the entities involved; including: CWA; the City of Cheste
13 PA; the International Brotherhood of Firemen and Oilers
14 Local 473 SIEU, Crozer Chester Medical Center; etc; I
15 found myself under intense pressure. Though COIN-
16 TELPRO was deemed illegal by the U.S. Senate in 1975,
17 the tactics, evidentally remained in use. Some of thes
18 tactics employed against me included: surveillance,
19 stalking and harassing; monitoring of my phone and co
20 puter, monitoring of my social activities and my associa
21 ions; the theft, forging or altering of evidentiary doc-
22 uments; witness tampering; threats and intimidat-
23 ion, and gaslighting.
24
25 (#13)   When the mediation ended with no conciliatio
26                 —over—

1 on March 18, 2008 (#10, lines 8-10) I began to call my
2 caseworker Ms Schley. To add to the pain I was still
3 experiencing from my injury, AND the mental anguish
4 from the constant harassment; Ms Schley would not
5 return my calls for months. I then contacted EEOC sup
6 ervisor Joan Gmitter; both were noncommital. I tried fo
7 months to get them to enforce the powers of the 1964
8 Civil Rights Act, they would not. It was frustrating.
9
10 (#14) On October 9, 2008 I was terminated illegally whil
11 on medical leave by CWA Assistant Human Resources
12 Manager Robyn Bennett. After several months of monit
13 oring my phone and computers they knew I could not
14 find an attorney willing to go against all of those who
15 had influence and exposure in the complaint. When I
16 called the EEOC regarding my termination I was rebuffe
17 by Ms. Schley who would not let me file a complaint agains
18 CWA; instead, she told me to call my union. Upon calling
19 the union I was told by the president Ron Kirschner tha
20 he could not help. The company's insurance agent, Holst
21 en and Associates of Media, PA also would not contact
22 me concerning a settlement. I finally heard from the
23 agent, Mark Alan Raith, in February of 2009. By that
24 time I was under a great deal of stress; out of finar
25 cial resources; and still had an unresolved issue wit
26                    — over—

1  my toe injury. I was unable to settle at the time Mr.
2  Raith contacted me.

3

4  (#15)   Shortly after my termination I went to the off-
5  ice of the U.S. Attorney for the Eastern District of Penn-
6  sylvania, who at that time (November of 2008) was Pat-
7  rick Meehan — former District Attorney for Delaware
8  County. There I reported the insurance fraud that my
9  EEOC complaint was largely based on. Of course, tha[t]
10 went nowhere.

11

12 (#16)   After being terminated I was trying desperately [to]
13 hold on to my house in Southwest Philadelphia. However[,]
14 in March of 2010, still injured and seeking medical att-
15 ention, I decided to leave the state in order to get awa[y]
16 from the corruption and influence of the people in
17 Delaware County. I chose Maine fully intending to get
18 treatment for my injury and then; once fully strength-
19 ened; return to Pennsylvania seeking adjudication of
20 my case and proper restitution.

21

22 (#17)   I arrived in Portland, Maine on March 10, 2010. Th[e]
23 next day I was directed to the General Assistance
24 (GA) office to apply for benefits. There a caseworker
25 "Carol" told me "you people come here and use up all

26                    — over —

1  of our resources". In my first full week in the state
2  (March 11th–18th) I was subjected to two discriminator
3  incidents (the other by Senior Human Resources Coordin
4  ator Aaron Guyer who, when I told him of several Fort
5  une 500 companies I wanted to apply to, replied "You
6  might as well forget that"); and was also denied med-
7  ical care at three separate facilities: Portland Stree
8  Public Health Center; Mercy Hospital Emergency Depart
9  ment; and Mercy Primary Care.
10        At the third, Mercy Primary Care, the physician
11  Noel Genova PAC uttered the same distasteful remark
12  as the GA caseworker (word for word). She then went on
13  to make references to incidents which occurred in Penn
14  sylvania; both at CWA and its health care provider Par
15  Care Occupational Health Center; this though I was a
16  new patient and had given her no prior information nor
17  the consent to obtain any. All of this was said through
18  a bevy of slurs and ultimately let me know there was
19  cooperation not only from state-to-state but also from
20  one city venue to another. I would soon realize that I
21  had entered into a whole new criminal enterprise.
22
23  (#18)   On March 14th, 2010 I had moved into the YMCA
24  of Portland with a rent voucher from GA. At that time;
25  of the approxiamately 90 residents only three were
26              —over—

1  Black, one on each floor. I was told shortly after
2 moving in that one particular resident was "allowed"
3 to call me 'nigger'.
4      On March 20th (only ten days in the state) I found
5 a job at the Clarion Hotel, though still suffering from
6 my injury and still very much in pain. However, thoug
7 I quickly found employment; got off of public assis-
8 ance; and began making self-insured payments to
9 Mercy hospital, the problems persisted.
10      What at first seemed like an unspoken policy of
11 racial discrimination and harassment would later be
12 given a clear voice by Governor Paul LePage when,
13 during a 2016 press conference, he suggested that
14 minorities were coming to Maine to "sell drugs and
15 impregnate white girls."
16
17 (#19)  On March 24, 2010, still in need of medical attent-
18 ion, I wrote a letter of complaint to Mercy Hospital to
19 let them know that two of their facilities had denied m
20 medical attention; the Emergency Department, and Merc
21 Primary Care (#17, lines 8,9). That letter was received by
22 Eileen Skinner CEO of Mercy Hospital who informed me
23 that she had just been promoted from Patient Advocac
24 there was noone there to receive my complaint, but sh
25 would help.
26             —over—

1      By April 14, 2010 I was given Mercy Free Care (thoug

2  I was already paying out of pocket) (#18, lines 8,9) and

3  after having images taken of my toe, was sent by Ms

4  Skinner back to Mercy Primary Care under the care of

5  Dr. James Katz who would be my primary care physic

6  ian. I was assured that I would be getting an oper-

7  ation on my right great toe at no cost through New

8  England Foot and Ankle and Dr. Peter Ameglio.

9

10  (#20)   On April 9, 2010 I received my first paycheck

11  from the Clarion Hotel. I noticed immediately that m

12  agreed upon hourly wage had been lowered by one

13  dollar. On the day that I applied I was hired on-the

14  spot and began working that very day; now they knew

15  who I was. This was another indication that my nan

16  and situation was being disseminated everywhere (#

17  lines 19, 20). After a contentious debate with manage-

18  ment my hourly wage was restored but I was cheate

19  out of my proper tips!

20      Soon the discriminatory behavior became mo

21  overt: a two-man job setting up banquets became n

22  working alone. Later, everyone working at the front

23  of the hotel became my boss. The cooks refused to

24  make me meals and the waitstaff refused to take m

25  order; I sometimes had to leave the hotel to buy food

26         —over—

1  I couldn't quit because I would be ineligible to re-
2  ceive benefits. Eventually I asked if I could take a
3  paycut and move to housekeeping; they said yes. All of
4  the workers in the front of the hotel were white; all bu
5  two in housekeeping were of African descent: from Su
6  an or Somalia.

7

8  (#21)  In May of 2010 I went to New England Foot and
9  Ankle. There I met Dr. Peter Ameglio, MD who took
10 images of my foot, explained the necessary procedur
11 for my operation, and set up a plan for my aftercare.
12 then sent me to his scheduling assistant. When she
13 found out that I lived at the YMCA she told me, "it
14 too nasty there, come back when you find a better
15 place to live".
16         That prompted a second letter of complaint,
17 also received by Mercy Hospital CEO Eileen Skinner (se
18 #19, lines 21, 22); who again told me that the new Pa
19 ient Advocate Melissa Skahan had just been promoted
20 so again I could not file a formal complaint: She on
21 again promised to help and on July 8, 2010 I finall
22 had my operation.

23

24 (#22)  Within a few weeks of the operation I knew
25 something was wrong. I expected some pain but
26         —over—

1  what I was feeling was unimaginable. The swellin
2  was not just confined to my toe (which was operate
3  on) or my foot; but went all the way up my right le
4  By mid-August I knew that I had been intentionally,
5  feloniously medically maimed; especially after all of the dis
6  crimination that had taken place, and my willing-
7  ness to report it,

8      I began asking Mercy Primary Care for a referr
9  al to see another doctor but their referral specialist
10  kept putting me off. This went on for weeks. By th
11  end of September 2010 I decided if I did not get a
12  referral by October 1st, I would seek help on my own

13

14  (#23)  On October 1, 2010 I went to Maine Medical
15  Center (MMC) and entered the Emergency Departmer
16  where I showed the physicians the site of my sur-
17  gery and the effects on my foot and leg. On that
18  day (which may have gone into October 2nd) they took
19  images of my toe and foot. I never heard anythir
20  On October 19th I returned to the Emergency Depart
21  ment, this time in extreme pain and seeking some-
22  thing for relief.
23      While in the exam room, feeling upset and
24  frustrated, I intimated that I might sue the docto
25  who performed the operation. The attending physic
26           —over—

1  ian then left and a different doctor came in. This doc
2  tor began loudly berating me and accused me of chas
3  ing pain medication; all but calling me a junkie. When
4  I asked to see the images the hospital had taken o
5  my prior visit (#23, lines 18, 19); he obliged. Every time h
6  pushed the button to change an image he yelled "yo
7  got nothing!"; he did this eight times. On the ninth
8  view the image turned sideways and showed a screw
9  going through my bone, into my soft tissue. We both
10 looked at each other shocked. He apologetically said
11 "that looks painful"; he then left the room and came
12 back with some pain medication to take then, and a
13 prescription to get some later. The name on the presc
14 ription was Justin Bennett.
15
16 (#24)   On November 1, 2010, less than two weeks afte
17 the Maine Medical Center (MMC) incident, I found my−
18 self back at Mercy Primary Care for an appointment. In
19 itially I was to be seen for flu-like symptoms but ha
20 recovered; however, I decided to show up so as not to
21 be listed as a no-show. When I was assigned to Noel
22 Genova PAC, the person who had greeted me with slurs
23 on my first visit (#17, lines 10−18), I refused to see her
24 I was then sent to an exam room where a physician's
25 assistant asked about my visit. I told her that I was
26                    −Over−

1  in need of pain medications; she then left and returned
2  telling me that the next available doctor was "not
3  certified" to dispense pain meds (this was the same
4  line I heard at Portland Street Public Health Center,
5  #7, lines 7, 8). I was told to come back in a couple of
6  days to see Dr. Katz. As I left everyone was laughin
7         On the way out of the hospital I was in so
8  much pain I decided to go to the Emergency Depar
9  ment. When the triage nurse saw that I was just
10 seen upstairs for pain meds, she thought that I was
11 involved in wrongdoing. She called in a male doctor
12 who confronted me. When I explained what had jus
13 happened he said, "wait here". When he returned he
14 he told me to go upstairs and get my prescription. t
15 seemed angry; not with me, with them. I assumed
16 he would file a report — I did not; I knew by this
17 time it would go nowhere. The next day, November
18 2010 I received an accusatory letter placing the blan
19 on me.
20
21 (#25)   On November 5, 2010 I called Mercy Primary Car
22 about the pain medication that they had given me; i
23 was not working for the level of pain I was in. Helen
24 the physician's assistant, began berating me and hun
25 up. I was at my wits end; I called the suicide Hot—
26              —OVER—

1  line. The call was dropped. I called again; that call was
2  dropped. On the third try I asked "why won't you help
3  me?" The person on the other end addressed me by
4  name— it was Michelle from Mercy Primary Care. She
5  told me "Don't do anything!", come in on Monday (it
6  was Friday) and see Dr. Katz. I didn't understand how
7  my call was reverted to the doctor's office but she
8  seemed concerned so I did what she said.
9          On Monday November 8, 2010, Dr. Katz wrote me
10 a prescription for 120 oxycodone pills (15mg) in add-
11 ition to the 112 oxycodone pills (7.5mg) written just
12 7 days prior: this without even asking to see my foot
13 This portends that; though no mention was made of
14 it, he knew about the screw going through my bone in-
15 to my soft tissue.
16         Though I called the suicide hotline on Novem-
17 ber 5, 2010 no one directed me toward help. Obviously,
18 the "concern" that I thought Michelle had was for
19 her office and the actions of the staff. After filling the
20 second prescription I was embarassed about being la-
21 eled a "junkie" so I took the 100 or so 7.5mg pills to Dr.
22 Katz and gave them to him (he accepted them).
23
24 (#26)    Following the disturbing incidents at MMC
25 in October of 2010; and at Mercy Primary Care in Nov-
26              — over —

1  ember of 2010: all semblance of proper medical care, as
2  pertains to myself, ceased. At the end of November I
3  was finally given a referral (see #22, lines 8-10) to see
4  Dr. Reed Gramse MD of Maine Orthopedics (11/25/2010) wh
5  loudly and angrily told that he saw my images and tha
6  nothing was wrong with my toe. The appointment
7  lasted less than three minutes. I was later sent to
8  Maine Orthotic and Prosthetic Rehab Services, Inc. wher
9  I was given a boot to wear. Every physician that I've
10  gone to following the surgery on my right great toe o
11  July 8, 2010; has either known about, or should have
12  been aware of the issue with this surgery and the cor
13  plications that arose from it. The physicians include:
14  New England Foot and Ankle; Mercy Primary Care; Port
15  land Internal Medicine, Dr. James Katz, MD; MMC Eme
16  gency Department; Mercy Hospital Emergency Depart-
17  ment; Dr. Justin Bennett, MD; Maine Orthopedics; Dr. Re
18  Gramse MD; Maine Orthotic and Prosthetic Rehab Serv-
19  ices Inc.; The Hospital of the University of Pennsylvani
20  (where I went during a visit home in 2011); Opportunit
21  Alliance and Dr. Karen Olson MD; the Mattina R. Proctor
22  Diabetes Center at Northern Light; and Martins Point
23  Health Center; and Joseph R. Rolland, PAC.
24        The failure to properly treat my toe following th
25  medical maiming and the cover-up thereof; has cause
26                — over —

1  not just chronic foot pain but complications such as: a
2  huge weight gain; chronic high blood pressure, type II
3  diabetes, stress, anxiety, inactivity and, of course the u
4  of pain medications for a prolonged period of time.
5      Though I went to Mercy Primary Care (and then Po
6  Hand Internal Medicine) for over 7 years, Dr. Katz never
7  at any time asked to look at my foot!
8
9  (#27)   Following the operation on July 8, 2010 I had to
10  again seek assistance (see #17, lines 23,24). My initial ex
11  posure to this system was so brief (just one week) that
12  I did not get an accurate view of how it operated, no
13  I would.
14      First, I noticed that there were very few Blac
15  people employed anywhere I went; if any at all. These
16  places included: General Assistance; the Social Securi
17  Office; Department of Health and Human Services; Cit
18  Hall; Police, Fire and EMT services; The Preble Street So
19  Kitchen; the food and clothing pantries; the local Ph
20  macies; the two major hospitals; counseling and so
21  ial services facities; Hannaford's Supermarket and th
22  Metro Bus Service.
23      Secondly, there were long lines everywhere.
24  Anything that a needy person sought—there was a
25  long line for. This included: General Assistance, Socia
26                    —over—

1 Security; Department of Health and Human Services (ther
2 on Marginal Way); The Preble Street Soup Kitchen; the foo
3 and clothing pantries; and the Greater Portland Transit
4 District Bus Garage (for bus passes),
5    Thirdly; these lines, which often began forming a
6 or near midnight, were used to harass and intimidate
7 those in need of services: if you complained or reporte
8 discrimination or abuse; your name would be dissemin
9 ated and you would be harassed everywhere!
10    I soon found that the City of Portland regularly a
11 systematically discriminates against minorities, the
12 homeless and those without the financial means or
13 the legal prowess to fight back. I've personally exper-
14 ienced discrimination at every state, federal, and loca
15 level of government; every medical facility; business
16 social service; and mode of transportation that I've
17 patronized since moving to Maine in March of 2010.
18    As a result I've been denied: proper medical care
19 dental care; access to public transportation and med
20 ical transport; safe housing; Social Security and dis
21 ability benefits (at both the state and federal level),
22 access to communications (both telephone and compute
23 the 911 system; EMT services; counseling and social servic
24 police protection and most importantly legal aid and th
25 fair and equal access to the justice system (e.g., the rig
26         — over —

1  to file complaints and police reports).

2

3  (#28)   Upon returning to General Assistance in July of 20

4  following my surgery, I noticed three things: first there

5  were very long lines which began forming around midnig

6  (#27, lines 5, 6). When I first arrived on March 11, 2010, I wa

7  ushered in as a new recipient; this was shocking.

8        Secondly, of the one hundred or so people in line

9  was often the only Black person. As such, I was freque

10  ly subjected to harassment. If other Black people were

11  receiving benefits at that time I don't know where

12  they went.

13        Thirdly, recipients were made to show up every

14  week (for what I would later find out were monthly

15  benefits) in order to apply for rent, food and non-food vo

16  chers. Recipients were told if they missed a week their

17  benefits would be forfeited because "GA does not pay

18  back bills". That, I would find out much later, was not tru

19  In fact, Section 13-2 Definitions of the General Assist-

20  ance program states: "Back bills are any charges and

21  services received prior to application. A bill that is du

22  in the same month in which an application is made is

23  not a back bill."

24        After months of standing in long lines in which

25  I was often harassed by other recipients and security

26                —over—

1  guards, and then faced discrimination and bullying by
2  caseworkers; I finally went to City Hall in July of 2011
3  It would be the first of three visits in which I spok
4  to three different Department of Health and Human
5  Services Directors who oversaw the administrations
6  of three different General Assistance Directors. On
7  that visit I spoke with Doug Gardner.
8      During that visit I discussed the problems that I
9  was having at the General Assistance program which
10 was then being directed by Palmer Peters. I spoke of
11 the harassment, abuse and denial of services by case
12 worker Tammy Morse. I also mentioned the long lines
13 and questioned the wisdom of having people line u
14 in the middle of the night to receive benefits; askin
15 "what if a woman is raped coming out at midnight?"
16      Following that meeting Tammy Morse was no longe
17 my caseworker but not much changed to the General
18 Assistance program. However, I began being harassed
19 everywhere. This included: the YMCA (my only resid-
20 ence since March 14, 2010 until the writing of this
21 document); Portland Internal Medicine, the DHHS
22 office; the pharmacies; Hannaford's Supermarket:
23 Paul's Food Center; the Preble Street Soup Kitchen (where
24 I had to eat due to inadequate distribution of my
25 food vouchers); the Metro Bus Terminal; and of course
26                    — over —

1  the General Assistance Program itself (the list was not
2  all inclusive).

3       I was harassed, stalked, verbally abused and
4  often was subjected to people trying to provoke me to
5  violence.

6

7  (#29)   By October of 2012 I was still unable to wor
8  due to ongoing complications from my operation (#21, lir
9  21, 22), and very much in need of things such as clothina
10 footwear; etc. When I asked my casework "Alex"(fem-
11 ale) I was rebuffed. I asked for a copy of the General
12 Assistance guidelines and she told me "no, go to the
13 library." Following that encounter, however, things bega
14 to change. Soon clients were allowed to apply for bene
15 fits every two weeks, and then eventually once a mont
16 I finally found out that my monthly food voucher.
17 allotment was one hundred and eighty dollars as opp
18 osed to the twenty dollars that I was given. Also I wa
19 allowed forty-five dollars for non-food as opposed to
20 just ten.

21      This was disturbing but I said nothing. Within
22 just a few months; during February of 2013, I was sus-
23 pended from the General Assistance program for inex-
24 plicable reasons. This was done, I believe, to force me t
25 leave the state of Maine. I did not.
26                    —over—

1  (#30)    I returned to the General Assistance program in Jur
2  of 2013 after being suspended for 120 days (during which
3  time my 81 year old father paid my rent); to find that Palme
4  Peters (#28, lines 9, 10) was gone along with several of the
5  caseworkers. Tammy Morse and "Alex" (#29, line 10, 11) stayer
6      The harassment continued for months but I dealt
7  with it the best I could. I was told that on December 3
8  2013 I would no longer receive Mainecare or Foodstamps
9  although my physician, Dr. James Katz MD, continuously
10 provided medical forms stating that I could not work.
11 Indeed, at the start of 2014 I had no benefits and had
12 to rely solely on General Assistance. I once again felt
13 these things were done in order to get me to leave the
14 state.
15      By September of 2014, determined not to go
16 through another year of harassment and abuse, I again
17 asked for a copy of the General Assistance guidelines
18 along with a copy of my file. The General Assistance
19 director Robert Duranleau who had replaced Palmer Pe
20 ers resigned!
21      I was stalled, maligned and put off for several
22 months; when I called City Hall I found Doug Gardne
23 (#28, lines 3-7) was gone and replaced by Dawn Stiles c
24 Department of Health and Human Services Director. By
25 the beginning of 2015 I finally receive what I asked fo
26      —over—

1  (#31)   Tired of the harassment and abuse I was experienc
2  ing everywhere I went, on January 6, 2015, I went to the
3  Portland Police Department to file a complaint against Bi
4  Bormet the director of the residential side of the YMC
5  of Portland, Maine (further explanation in later paragrap
6  I was met by two officers Pavlis and Grass who took me
7  into an interview room. I detailed the harassment and th
8  places involved, but, as soon as I mentioned General Ass
9  istance they got up and bolted from the room. It was
10  odd behavior, and when they returned they refused to
11  give me a copy of the police report.
12       The next day Bill Bormet the YMCA director was
13  gone!
14
15  (#32)   By February of 2015 I had read the City Ordin
16  ances concerning General Assistance. When I read the
17  part about Back Bills (#28, lines 19-23) I understood wh
18  the caseworkers wanted me out of the program. There wc
19  never any reason to stand in line every week and any-
20  one who had their benefits forfeited, had them stolen.
21       Up to that point, due to the racial slurs and an-
22  imus I felt that the problems only involved myself; no
23  I knew it was much larger.
24       IN February of 2015 I reported the theft of ben-
25  efits to Dawn Stiles Director of DHHS in City Hall. She
26                    —Over—

1 told me that she would investigate.

2     By May of 2015 she had instructed "Jon" a casework

3 er at GA to lower my food vouchers by fifty-eight dol

4 ars saying that I lived at the YMCA so my rent was

5 to be paid for four weeks instead of monthly (???).

6

7 (#33)   By 2016 I knew that there was a concerted eff

8 ort to keep me from reporting when: the Portland Polic

9 refused to allow me to file charges; though I had recei

10 ed a copy of my personal GA file the year 2010 (with th

11 most theft of benefits) was missing; I had been summa

12 ily dismissed by two Directors of DHHS; and on several o

13 asions Pine Tree Legal had refused me service.

14     In December of 2016 with GA caseworkers still

15 attempting to push me out of the program, I went to

16 the Portland Public Library to seek information on ho

17 to do things on my own. The head of security at the li

18 rary was a former security guard at GA. On December

19 2016 I ordered a book entitled How To Represent Your

20 self In Court. On my next visit to GA I was paired wit

21 Tammy Morse.

22     Immediately in anticipation of a legal proble

23 Tammy and others began trying to gain access to my

24 personal information by sending me to Med Access to

25 get medications I had been getting for years from GA

26     — over —

1    By 5/17/17 I was told I was being suspended
2  from GA for 120 days for not signing papers that woul
3  give them access to my personal information. At that
4  time David MacClean had replaced Robert Duranleau
5  as the Director of General Assistance. In my <u>Request for</u>
6  <u>A Fair Hearing</u> I reminded Mr. MacClean that coercion
7  and extortion were crimes. I was allowed to remain.
8    The thought of being made homeless was extreme
9  stressful and caused me to temporarily halt my pursu
10 of justice. The stress was debilitating.
11
12 (#34)   In June of 2017, following the "Fair Hearing", I
13 was made to send in an application for Mainecare Di
14 ability which was sealed and mailed-in in front of M
15 MacClean; in which no personal information that I d
16 not want disclosed was entered. After that I no longer
17 heard from him and he was replaced by Ryan Gomea
18 the new GA Director.
19    The harassment went on as I was continuou
20 made to take Workfare paperwork to my physician
21 in order to "prove" that I was disabled although
22 Dr. James Katz MD had made that designation
23 years earlier. When I complained I was told that
24 "permanantly disabled" doesn't actually mean tha
25 it's permanent (??).
26                    —over—

1  (#35)   By 2019 I again, being fed up, went to City
2  Hall. Now Dawn Stiles was no longer Director of DHHS
3  but was replaced by Kristen Dow. I again reported the
4  theft of benefits and Ms. Dow said she would look into
5  it. In September of 2019 she told me that I would again
6  have to apply for Social Security (though I had done so
7  previously). She gave me an address to go to, 231 Fore
8  Street in Portland; which I thought was odd. I called
9  the information hotline and was directed to 550 Forest
10 Avenue — but go to the side door (also odd). When I went
11 there was a sign posted saying that they had relocated
12 to the Fore Street address. I took a picture of this
13 posting with my cell phone.
14        The site was bogus and fraudulent but I was
15 sent by a government official. I had no where to turn
16 and they knew I took the picture. That phone would
17 later wind up disabled and through a good deal of
18 the pandemic I had no service, and later no phone.
19        From the time I returned to GA after my surg-
20 ery (#28, lines 3, 4) until the writing of this document
21 I have been made to run back and forth to the doctor
22 office to provide proof of disability on ever-changing
23 paperwork. Caseworkers were deliberately trying to har-
24 ass me to leave the state or go to work in order to ab-
25 solve the doctors of responsibility and to hide their theft
26                    —over—

1 The stress of having to deal with the caseworkers while
2 also dealing with the abuse was overwhelming. It con-
3 inues to this day.
4
5 (#36)     As previously stated (#31, lines 2,3) on January 6
6 2015 I went to the Portland Police Department to file
7 charges against Bill Bormet director of the residential
8 program of the YMCA of Portland, Maine; for theft, ex-
9 tortion and harassment. After a forty-five minute wa
10 in the lobby, two uniformed officers, Pavlis and Grass
11 came in the front door and took me to an interview
12 room. There I detailed how I was being extorted for
13 pain medications and having to constantly deal with
14 thefts of those medications and belongings. I then spok
15 of the harassment, which had began in Pennsylvania,
16 continued through my operation and now I was havin
17 to deal with it everywhere. When I mentioned Genera
18 Assistance they bolted from the room.
19      Upon returning to the room they then asked for
20 my I.D. which they then took, presumably to copy it
21 or run for prior arrests. When they came back I was
22 told, "we can't say anything to Bill Bormet because
23 he still has to take care of you". I took that as a
24 veiled threat. When I asked for a copy of the police
25 report I was told they don't give out police reports.
26              — over—

1   I was then ushered out.

2        ' Later that evening, feeling disgusted that I had
3   finally taken that step but accomplished nothing, I
4   called the non-emergency number to speak with some
5   one about what took place. When I described the in-
6   cident to the operator she told me it couldn't have
7   been Officer Pavlis because he was on leave! I told he
8   they had given me a business card with both their nam
9   and she knew something was wrong; she gave me a
10  different number and let me know she did not want
11  be involved.

12       After speaking with that operator I remember
13  ed that as I was leaving the police station there wa
14  a shift change. Officers were greeting officer Pavli
15  as if they had not seem him in a while. I then be
16  came aware that he came in just to take my state
17  ment and then he could claim he wasn't there. This
18  seemed similar to the incidents with Eileen Skinner
19  at Mercy Hospital (#19, lines 21, 22), (#21, lines 17, 18) in
20  which I was not able to file a complaint.

21

22  (#37)        The incident at the Portland Police Depart-
23  ment in January of 2015 was not the first. In April o
24  2010, just weeks after my arrival on March 10th, I
25  was approached by a bicycle officer at a park on the

26                      —over—

1  corner of Congress and High Streets and asked for my
2  I.D. When I asked why, I was told that I was acting
3  suspiciously. "Most people sit facing that way"; I was
4  facing a wall! After running my name (it came back with
5  no warrants) I was told next time I don't comply right
6  away "you're going to be thrown against that wall".
7          I realized later that this was after the letter
8  (at least the first one) to Eileen Skinner at Mercy Hospital
9

10  (#38)   In the summer of 2011, while shopping at the
11  Hannafords Supermarket, I approached a female cash
12  ier with whom I had regular "polite" conversations.
13  On this day she was at the customer service counter;
14  when I asked for a bus validation she leaned on the
15  counter and began acting seductively and speaking in
16  a provocative manner. We did not speak to each other
17  that way. I immediately began looking for cameras
18  when I looked straight at the two-way mirror I saw
19  a Portland Police officer. Feeling that I may be able
20  to see him; he ducked to one side: when my eyes fol
21  owed he quickly ran from the room as if he was doi
22  wrong!
23          I never again had conversations of any kind
24  with that employee.
25
26                    —over—

1  (#39)          On July 4, 2012 around midnight, I
2  stopped at the Big Apple store on Park Avenue in
3  Portland where an employee allowed me to use the
4  phone to call 911 for a ride to the hospital. When the
5  EMT personnel arrived they refused to transport me. I
6  called a second time; this time the operator asked if I
7  would like an officer to respond; I said "yes". When th
8  officer responded (a corporal) he seemed angry asking
9  me, "do you want me to get out of this car"? Then the
10  EMT's showed up. I was surrounded as if I was going
11  to be jumped. The office, speaking as if I wasn't even
12  there, told them that the shelter down the street was
13  closed and I was looking for a place to lay up (I had
14  a backpack with Bible and meds). I told them that I
15  was not homeless, that I lived right up the street an
16  they all grew concerned knowing that he had spoken ou
17  of turn. Instead of making it right and giving me a
18  ride, he told them if I made it this far I could wal
19  to the hospital — which I did.
20          The whole incident was stressful, scary and hu
21  iliating. It also led to several other incidents including
22  later that night at Maine Medical Center where I walk
23  seeking medical service; being threatened by the manage
24  of the Big Apple after she voluntarily showed me videos
25  of the two interactions with the EMT services, and;
26          — over —

1 after contact the Director of the Fire/EMT services
2 concerning those incidents, someone entered my room
3 and tore up everything I had written about the matter

4

5 (#40)   Concerning my residence at the YMCA of Portland
6 ME: I arrived in Portland on March 10, 2010 as previously
7 stated (#17, line 22). Seeking a place to stay, I was directe
8 to the YMCA by a taxi driver. There I talked to Bill Borme
9 the residential director whose main concern was how I wa
10 going to pay my rent; and though I told him "cash", I
11 moved in on March 14, 2010 with a rent voucher from the
12 General Assistance program. Not long after moving in the
13 problems began. I would soon find myself being racia
14 ly harassed; exturted for the legally prescribed prescr
15 iption medications I possessed; subjected to a syster
16 of community stalking and having to deal with bug ar
17 insect infestations: all of this while trying to resolv
18 the medical issue which made me seek refuge in the
19 first place (see #16, line 15-20).
20       All of this was stressful and would cause me,
21 later, to seek relief from counseling.

22

23 (#41)   When I moved into the YMCA, as previously
24 stated; of the approxiamately 90 residents only three
25 were Black; one on each floor. I was told that one
26          — over —

1  resident, John McConnell, was "allowed" to call me
2  'nigger' (see #18, lines 25-3). Whenever I tried to att
3  end "Y"-sponsored activities (e.g., movie night, game
4  night) that is exactly what he did. Noone in the room
5  ever objected. Other incidents included: having a
6  bunch of bananas hung on my door knob; another res
7  ident, "Buddy" pulled a banana from his pocket and
8  asked if I 'wanted some lunch'; Vanessa, the recep
9  ionist, once when I entered the building, handed m
10 a canvass bag filled with donations. As I walked b
11 people in the lobby were laughing. I got upstairs an
12 noticed one side of the bag said 'save the chimpanzee
13 with the picture of a chimpanzee on it. I kept the
14 bag — they retrieved it.
15       The YMCA has been my only residence since comi
16 to Maine. Though the racial make-up of the residentia
17 program has changed, the harassment to myself has no
18 It has been a long (over ten years) period of humiliation
19 and has been degrading, debilitating and stressful.
20
21 (#42)   One week after moving into the YMCA I began
22 working., March 20, 2010. A few days after starting; upo
23 my return, "Buddy", met me at the elevator and said,
24 'we want some of those pills'. He went on to describe
25 the prescription pain meds that I had when I moved in
26             — over —

1  I told Bill Bormet the residential director that my room
2  had been searched., he said it could not have happened. Wh
3  I insisted that it did; he became adamant.. I got the
4  message.
5       I was soon being extorted for pain medications
6  which I began receiving regularly (from 2010 - 2017) from
7  Dr. James Katz. My room was entered often and they
8  took whatever they wanted. I did not have the resour
9  ces to either move or buy furniture., again it was hum
10 iliating. Someone asked me how I got into the YMCA so
11 fast: in hindsight they may have thought I came to
12 Maine to sell drugs (see #18, lines 13-15). This theme kept
13 coming up over and over.
14
15 (#43)   By July of 2011, after having made a trip to
16 City Hall to see Doug Gardner concerning GA issues: the
17 community harassment became intensified(#28, lines 18
18 2 of next page). At the YMCA specifically, every time I woul
19 enter the building; as I would come to my floor, the sam
20 resident would have his body up against the elevator doo
21 so that when it opened we were face-to-face. I would th
22 have to back up and let him on to get out. It was odd at
23 first, but when it happened over 20 times — it became
24 harassing and had to be coordinated by someone lettin
25 him know when I entered the building. If this soundssill
26            —over—

1  it is! Every time I would go to the washroom down the
2  hall to clean meats or vegetables I would come into the
3  hallway and have to walk through several people on m
4  floor who would line up on each side. The crowd grew fro
5  four to 10 at some points. When I would come out of the
6  bathroom, someone would "bump" into me going in. Wh
7  is an occassional incident became constant. (I was onc
8  "bumped" in Hannaford's Supermarket nine times in
9  one visit. I was constantly taunted in an effort to get
10  me to fight. I would not give in. Eventually the res
11  idents would tire of one thing and try something els
12  Most was too silly to report.
13          Due to the escalating intensity of the bullyin
14  I would often just stay to myself. The one place the
15  could often bother me was at the elevator (I soon be
16  gan to avoid riding with others — pre-COVID). These pro
17  blems did not begin and won't end with the current sit
18  uation with the pandemic!
19
20  (#44)      After months of enduring harassment by resid-
21  ents and staff, another problem arose: insect infestation. Th
22  became another way to harass and extort. I would seek
23  help for weeks and if I heard nothing from staff some-
24  times I would have to go through another resident.
25          The bug situation was not just nasty it was humil
26              —over—

1  iating. Sometimes while out in public I'd have to worry about
2  bed bugs crawling across my clothing. I felt as this was be-
3  ing used as an effort to get me to either move out or to
4  comply with the negative things going on.
5
6  (#45)    In February of 2014 I had just been kicked off of
7  Maine Care and Foodstamps, but had decided to get a pro-
8  cedure done on my hand. I called Mercy Hospital and spoke
9  to Katie Kerr. She told me I would have to fill out an app-
10 lication. One day I went to the washroom to wash dishes
11 and another resident, Daniel Tucker, came in behind me also
12 with his dishes ! Katie called. Daniel started banging loud-
13 ly so I couldn't talk. I went back to my room to call Katie
14 I was told Katie had just left. At the time I thought Dan-
15 iel's actions were justified; after all he had things to
16 do also. However, over the next ten days the incident
17 played out three more times with him; the dishes, and
18 Katie Kerr!
19        This was well planned and the harassment by Dan-
20 iel became so bad I began going to other floors to use
21 the bathroom; and, doing dishes one at a time as to not
22 spend much time dealing with him (and others) on my
23 floor. I gave up on trying to get that procedure on my
24 hand and suffer pain from it (my writing hand) to this
25 day.
26              —Over—

1  (#46)     In February of 2014, shortly after the incident
2  described in (#45), I made a trip to Pennsylvania to go
3  to the EEOC of Philadelphia still trying to adjudicate th
4  suit filed in November of 2007: this was the second such
5  visit; the first being in November of 2011. While there I
6  also went to the U.S. Attorney's office. When I return
7  ed to the YMCA, as I was putting my key in my door,
8  the first thing I heard as a staff member left John
9  McConnell's (see #41, lines 1,2) room was, "we're getting
10 rid of him". A couple of weeks later I got a call from
11 Katie Kerr — Patient Advocate for Mercy Hospital: This
12 time I did not call back.
13         Throughout 2014 I was still being subjected t
14 harassment, bullying, "gaslighting", COINTELPPO-style
15 (#12, line 23-4 of next page) community surveillance, and
16 stalking. This along with the rampant drug usage at th
17 YMCA; which resulted in an inordinate amount of death
18 (two in July alone; Jason Baron, July 14, 2014 and Donald
19 Harmon, July 28, 2014 both on my floor), I decided to go
20 to the Portland Police Department which I did on Jan
21 uary 6, 2015 (#36, lines 5-7). The next day, Bill Bormet
22 director of the residents was gone; though a letter wa
23 passed to everyone at the end of February stating that
24 Bill was "leaving indefinitely". I kept that letter; they
25 took it!
26                    — over —

1  (#47)    From the time that I moved into the YMCA on
2  March 14, 2010 until January of 2015; when I went to th
3  Portland Police Department (#31, lines 2,3) and Bill Borme
4  left as director of the Men's Dormitory; there was a racke
5  going on. At the time that I moved in the clientele was
6  very young and very transient. Clients (residents) were get
7  ing kicked out or arrested frequently and after 30 days the
8  property was sold. Secondly; certain residents had keys t
9  the rooms and would often go room-to-room syphoning off
10 small quantities of pills and goods (often pulling fire alarm
11 to get people to leave) so that other residents would not
12 notice. Thirdly; drug dealing, extortion and threats
13 were prevalent.
14          When Bill Bormet left people were angry. I
15 faced harassment, bullying, stalking, intimidation, an
16 threats of violence by everyone from residents to
17 custodians, staff members, receptionists and several
18 residential directors who've come in since.
19
20 (#48)    By 2016 Eddie Barajas was the director of
21 the Men's Dormitory. Before I had formally met Eddie, h
22 approached me in an aggressive manner when I came
23 through the handicap door. This was a familiar source
24 harassment by staff since my surgery (#21, lines 21,22)
25 but I was surprised because I did not know him. I very
26                    —over—

1  quickly understood that the harassment was going to
2  continue through him (which it did); and I chose to av
3  oid him.
4        On February 20, 2016 my mother passed away. She
5  told me before passing that she was leaving everything
6  me as she and my sister (my only remaining sibling) did n
7  get along. On March 3, 2016; my sister sent a fax to Eddi
8  Barajas in which she asked him to get me to sign a lett
9  er of renunciation. Eddie was, of course, not a friend of
10 mine, nor a counselor, mentor, advocate or any kind of
11 caseworker. I was extremely upset by this; he could have
12 left this note under my door. Instead he tried to force m
13 to sign it. I was intimidated by this.
14        On March 25, 2016; the day of the Clinton vs. Sanders
15 New York primary; I went to the Portland Public Library
16 where I intended to get a death certificate for my mother
17 and return home to watch the results. Instead, I was
18 stopped at the copier by the Chief of Security (formerly a guar
19 at General Assistance and walked to the security office
20 (by the exit) to talk to me about something minor. Though
21 I did finally get a copy I never got the chance to use it
22        A few weeks later Eddie came to my room again
23 saying, "Come on Greg let's get these papers signed". Again
24 I found this extremely intimidating; and I finally, du
25 to stress, gave up. My sister, Judith Ann Sullivan, gain
26                       — over —

1  ed my rightful inheritance through harassment, intim-
2  idation and theft; and did so across state lines; with
3  the assistance of Eddie Barajas.

4

5  (#49)   Eddie Barajas left the YMCA of Portland, Maine
6  in March of 2017 and was replaced by Branden P. Ananis
7  as Director of the Men's Dormitory.
8          On July 11, 2017 I went to the Federal Courthous
9  to seek information on filing this very lawsuit (though r
10 actions have been delayed; the crimes and infractions kep
11 piling up). When I returned to the YMCA; the reception-
12 ist, "Roberta", knocked on my door to tell me my father
13 was ill. The very next day staffmember Ray Emerson car
14 to tell me my father had passed away. I said, "O.K." and
15 shut the door. He knocked again and said, "No, really
16 your father passed. Again, I said "O.K." and shut the
17 door. He knocked yet a third time; this time he began
18 making hand gestures and miming as though we were
19 having a conversation or he was expressing condolences
20 this in front of the cameras at each end of the hall.
21         By this time it was known by many that I was act-
22 ively trying to bring closure to this long-running nigh
23 mare. This was more "gaslighting" and intimidation.
24 wanted to slam the door in his faced but I feared th
25 consequences.
26                          — over —

1  (#50)     In January of 2015 I became very ill and
2  was unable, briefly, to take care of personal business. I
3  had no money; though I should have been able to coll
4  ect MaineCare Disability; and I could not get to Gener
5  Assistance for my rent and food vouchers. I tried in
6  vain to get someone at General Assistance to tell me ho
7  to clear this hurdle; they would not. Finally, I called
8  the office of City Manager John Jennings. I was also
9  given the number of Ethan Strimling; neither would
10  return my calls (I had also gone to the City Manager'
11  office in 2015, after speaking to Dawn Stiles and rep
12  orting theft of benefits (#32, lines 24, 25) with the sam
13  results).
14       One day YMCA staffmember Ray Emerson knocke
15  on my door with a young man from Ehrlich Pest Contro
16  who came every three months to spray. I told him th
17  I was to ill to leave for the treatment. Ray said th
18  they just needed to check for bugs. The worker ther
19  came in, went by my bed where my phone was and
20  turned his back to me. When he left my room I imm—
21  ediately checked my phone and found all calls to
22  City Hall deleted. I immediately began making mor
23  calls; finally General Assistance sent a taxi for me
24  and I went to pick up my benefits.
25       This was one more instance of different entitie
26            — over —

1  collaborating to deprive me of benefits in a very harass

2  ing, intimidating and insulting manner.

3

4  (#51)      On November 22, 2018 I stepped out of my

5  room about 2:00 a.m. to wash dishes while avoiding

6  others, as was my habit. When I opened the door-the

7  stood Director of the Men's Dormitory Branden P. Ananis

8  talking with a young women (who I later learned was a

9  friend of the young man across the hall). Feeling that

10 something untoward was going on, I went back into my

11 room. As I was going in I heard her say, "I need to get

12 my stuff". Later, I washed my dishes; and then I wen

13 to another floor to take a shower. I then began lookin

14 for something and happened to search a piece of lugg

15 age that I had not used in a long time; there I four

16 some female hairstyling tools. I was incensed! It

17 was not lost on me that a screenshot from the secu

18 ity cameras would have shown Branden; the young

19 woman; and myself briefly outside of my room — an

20 then her "stuff" turns up in my closet. I went down

21 stairs to confront Branden but was told by staff mem

22 ber Lissette Rosado that he was gone. She told me we'

23 going to get rid of them (the guy across the hall, and

24 the young woman) tomorrow.

25        A few hours later I had an appointment

26              —over—

1 at General Assistance. When I got there I immediate

2 got the sense that they knew about the incident at

3 the YMCA. I knew for sure when my benefits were given

4 to me and the fifty-eight dollars that was taken from

5 me in 2015 (#32, lines 2-5) was restored by my casewor

6 er, Matt MacMillan.

7

8 (#52)   I had finally gotten my Foodstamps back in May

9 of 2018 via the Maine Hunger Initiative (though they

10 still denied me MaineCare). However, in February of 201

11 after a strange encounter with Kristen M. Ellensohn

12 FNP at the Mattina R. Proctor Diabetes Center (full ex

13 planation in later paragraphs); I finally got my Maine

14 Care restored also. I now felt more empowered to agai

15 try to seek adjudication of past legal issues and ful

16 restoration of all that was taken from me.

17          I then, in March of 2019, called my son and spo

18 of my mothers passing. I related to him that my sis

19 ter had "done something foul" and I hoped he wasn

20 involved. I also exchanged a few phone calls and sev

21 eral text messages with my sister, which quickly tur

22 ed negative. Soon I again fell out of touch with ther

23 both. Several months later a meeting was held at the

24 YMCA in which the residents were told that Eddie

25 Barajas would be returning as resident director. I

26              —over—

1  knew this would be problematic because of the incident
2  with the letter of renunciation (#48, lines 7-13; 22-25).
3
4  (#53)   In January of 2020 (shortly after the five year
5  tolling of my visit to the Portland Police Department had
6  expired #36, lines 5-7); Eddie Barajas was back at the
7  YMCA. At this time I was actively pursuing this very
8  lawsuit, and having access to my room, the staff at the
9  YMCA knew this. Eddie not only approached me inside
10 the building but when I left building he would app-
11 roach me in the street. When I asked for a receipt
12 after paying my rent I was told to see Eddie. If I
13 asked for a copy to be made on the copier, I was told to
14 ask Eddie: this to make it appear that he was my
15 caretaker; he was no such thing.
16        In June of 2020 I began doing searches on
17 my cell phone concerning legal statutes. I looked up
18 the statute for stalking, harassment, and intimidat
19 and suddenly I could no longer use my phone. When
20 ever I turned it on it said "phone is reconfiguring".
21 I called for a replacement and was told I could not
22 get one; it was too soon.
23        I lost all searches of legal materials plus
24 the images from my camera that I had taken of
25 the fraudulent Social Security process that Kristen
26              — over —

1 Dow had sent me to (# 35, line 9-13). I had no phone
2 through several of the worst months of the pandemic
3 The phone number that I had at that time was (207
4 408-8403; when I finally got my new phone in May
5 of 2021, the number was similar (207 450-8503), but be
6 longed to someone else! I turned on a brand new cell
7 phone with someone elses Facebook already on it.
8
9 (#54)   In November of 2020 Eddie Barajas informed
10 me that I needed to provide him with documentat-
11 ion of my disability in order to use the handicap e
12 it; this, though I had been at the YMCA for over te
13 years, and; this was Eddie's second stint as directo
14 of the men's dormitory. We had been through this iss
15 ue in 2015; and I had gone through this same nonsens
16 with those who came before him.
17       In December of 2020 after being diagnosed wi
18 COVID-19; I went into a quarantine shelter for ten
19 days. During that time I still had to deal with the
20 going harassment. I was rushed out of the YMCA wit
21 out time to get all of my medications: when I contin-
22 uously asked for them, I was asked if I really needed
23 them. "You're not going to die if you don't get them are
24 you?!", I was asked. Eddie Barajas called one day a
25 asked what my symptoms were. I was already in
26                 — over —

1 quarantine and the YMCA is my landlord, why would
2 he need to know that! I told him I am dealing with
3 the Maine CDC concerning my health. He said if I did
4 not tell him, he would call the Preble Street Shelter to
5 find out. Blatant harassment.
6
7 (#55)  On December 27, 2020 I returned from COVID
8 quarantine to the YMCA to find out that Eddie Barajas
9 had been replaced by Trevor Prophet as the Director of
10 the Men's Dormitory (though Eddie remained at the "Y"
11 until March of 2021). I soon noticed three things whic
12 affected me personally.
13          First, there would be a continuation in my
14 struggle to go in and out of the handicap exit. I
15 told Trevor of Eddie's edict that I had to show hir
16 proof of my disability (#54, lines 9-16) and though
17 I finally complied; Trevor told staffmembers that I
18 had to have a cart to use the door. This was demear
19 ing.
20          Secondly, there was a continuation in the patter
21 used both at the YMCA and other entities; of takin
22 things away (privileges, property, resources, etc.) from
23 those who refuse to conform to the wishes of those
24 involved in wrongdoing (#27, lines 7-9). Shortly afte
25 my phone was rendered inoperable (#53, lines 19, 20)
26                    — OVER—

1   a staffmember gave me a television that was donated
2   to the YMCA. Inexplicably, that staffmember, Kimberly D
3   Lopez, confiscated my television. Soon the donated T.V
4   proved to be defective, leaving me with no source of
5   entertainment or access to news during some of the
6   most distressing months of the pandemic. I related
7   this to Trevor in March of 2021, he said he would "inves
8   igate the matter. I heard nothing for months. In Jun
9   of 2021 I went to the Federal Courthouse to prepare fo
10   this very document. In July Trevor Prophet and Lisette
11   Rosado knocked on my door and removed my toaster ove
12   (I've had one at the YMCA for ten years). After press-
13   ing Trevor I finally got my T.V. (I found that the phor
14   had the chip removed)!
15           Thirdly, in addition to the harassment that I
16   had been subjected to for years by Daniel Tucker (# 45
17   lines 10-18) and others; a new crew of residents emerged
18   which seemed intentionally purposed to harass and in-
19   timidate. These residents: Tim Hubner; James Moseley
20   William Garland; Michael Barker and Brent Sentholtz
21   began stalking, harassing and intimidating on a reg-
22   ular basis after Trevor became director; with the latte
23   two threatening me with physical violence. After m
24   visit to the Federal Courthouse in June of 2021 a lot
25   of it shut down, not coincidentally!
26               — over —

1  (#56)     Concerning more recent medical problems: on 5/31/18
2  I began visits at the Matlina R, Proctor Diabetes Center at
3  Mercy Hospital. I first saw Dr. John T. Devlin, MD but soor
4  my care was taken over by Kristen M. Ellensoh, FNP. At
5  around this same time I was told by Megan L Black, N'
6  that she would no longer see me as a patient at Portlar
7  Internal Medicine: I had been transferred to Megan by
8  Charles Therrien, Mercy Hospital President after a meet
9  ing in 2017.
10
11  (#57)     During one of my first visits with Kristen, I
12  informed her that the Metformin that I was taking
13  was causing me immense pain. She spoke with me
14  about several alteratives but never changed my pre
15  scription.
16          As time went on during my visits I bega
17  to notice a pattern where Kristen would mention
18  persons or facilities that were potential defendant
19  in this very lawsuit (to my discredit this process has
20  taken way to long and started prior to my visit to
21  the Portland Police Department in January of 2015
22  see #31). At one point she brought in a copy of a doc
23  ument from the office of Samuel Scott, MD of Maine
24  Orthopedics and slammed it on the desk shouting,
25  "you signed this".
26                    — over—

1  (#58)   On 1/9/19 I had a physical examination performe
2  by Kristen Ellensohn. At that time I showed Kristen the
3  area of my operation (right great toe) and showed her th
4  point where the screw was pushing through the skin; I
5  also showed her that my toe was purple and showed
6  her the swelling of my toe and foot and also made not
7  of the swelling of my right hand (for which I was tre
8  ed by Dr. Samuel Scott of Maine Orthopedics).
9       When I received my summary at the end of the
10  visit there was no mention of anything that took place
11  I asked her to document what she saw. At first she re
12  fused; but then she angrily relented. I was angry also.
13
14  (#59)   On 1/31/19, when I went in for my visit, the first
15  thing I told Kristen was that I was tired of the impromptu
16  depositions she was subjecting me to. I also asked her for
17  a copy (and review) of the blood tests I had done back
18  September of 2018. She refused to go over the results. When
19  she left the room a man came in and introduced him
20  self as my caseworker. His name was Brendan Johson.
21  told him that I did not ask for a caseworker. He then
22  said, "full disclosure; I represent Mercy Hospital, Mai
23  Medical Center, and the City of Portland; I'm with the
24  Minority Health Program". I asked him for a business ca
25  he had none; Brochures about the program, he had none
26                    —over—

1  (#60)   Brendan Johnson promised to help me get my
2  MaineCare back which he did in less than two weeks
3  and, although I appreciated it, I knew it came through
4  nefarious means. In anticipation of this suit which the
5  knew was coming, the three entities that he said tha
6  he represented had interests that conflicted with min
7  I soon began to see a pattern of their playbook:
8
9       • lead me to all of the institutions which had
10  previously discriminated against me that way they
11  could mitigate all of the negative things that were
12  done to me while also exculpating all of those tha
13  were involved
14
15       • get the doctors at these places to make it
16  appear that I no longer have any medical problem
17  though I've been deemed permanently disabled
18  for years; thereby absolving DHHS of responsibility
19  for denying me MaineCare Disability.
20
21       • make it appear that I have mental or
22  cognitive issues that would make all of my alleg-
23  ations seem false.
24
25       • make it difficult for me to do business or
26                          — over —

1  obtain prescriptions or provisions as a way to dissuade
2  me from moving forward.
3
4   (61) On 2/11/19, less than two weeks after telling Krister
5  Ellensohn that I was tired of her impromptu deposition
6  I had my first appointment at Greater Portland Health
7  after being told by Portland Internal Medicine that I
8  could no longer be seen there for dropping Dr. James Kata
9  as my primary care physician (this in spite of the fact tha
10  I had two visits with Megan Black, PA-C).
11        When I went in, I was told by a nurse's aide, "you
12  know, she doesn't have to write you any prescriptions".
13  took this to mean that if I wanted to be treated I'd
14  better be agreeable. As soon as Gretchen Speed came in
15  it was an extension of what I experienced with Krister
16  I knew going in that I would not be a patient, however,
17  and she did write me prescriptions for three months, so
18  I did not complain.
19
20  (# 62)   After calling DHHS and specifically asking for
21   'no Mercy, no Maine Med, and no City of Portland
22  affiliated physicians; I was set up with Dr. James
23  Riddleberger of Martins Point Health Care.
24        On my first appointment, 4/15/19, I told Dr.
25  Riddleberger that I was experiencing severe pain
26                        —over—

1  as a side effect from my Metformin medication. I asked
2  if he could change it: he refused. I found that odd. In
3  order to keep from beginning another long-running issue
4  like I had at Mercy Primary Care / Portland Internal
5  Medicine, I asked to speak with someone from their
6  administration. A few days later I met with a woman
7  for about forty-five minutes. When the meeting was over
8  she said, "I hope you felt heard". I felt I was being
9  patronized. I asked for her business card for future
10 references. It was then that she admitted that she was
11 not from administration. She tore off a piece of paper
12 and wrote her name, Lori MacDonald on it. I was
13 incensed! This same pattern had been used at Mercy
14 Hospital, the Portland Police Department and now at
15 Martin's Point.
16        On 4/26/19 I met with Flora Cilley — Manager
17 Practice Operations. She asked if I would like another
18 physician — her idea not mine. I agreed. She later told
19 me that it would be a while; the doctor would be
20 coming from another facility. I was set up for at least
21 two more appointments with Dr. Riddleberger, and
22 although I asked every time for a summary of my
23 visit I got none.
24
25 (#63)   On 9/26/19 I had my first appointment with
26                —over—

1   Dr. Pamela Courtney, DO. The first question that she
2   asked was what state was I from. When I said
3   Pennsylvania she told a xenophobic joke about the
4   Amish. I got the impression that she had one for
5   every state. It was offensive; I let her know that. The
6   appointment did not last very long as it was described
7   by Dr Courtney as a "meet and greet". I filled out some
8   paperwork and left. A few months later the pandemic
9   began and I, like many others, was prevented from
10  going in to the office but continued getting my
11  prescriptions at the pharmacies.
12
13  (#64) Throughout 2020 I managed to get by withou
14  going back to the doctor's office. Even though the
15  pandemic was still ongoing I soon realized that I
16  was being pushed by GA to have the doctor fill out
17  Workfare paperwork, though by October of 2020 I
18  was almost sixty years of age. I felt that Dr Courtne
19  was supposed to write a negative report in another
20  attempt to force me out of the General Assistance
21  program. Upon insistance I finally got summaries
22  of my doctor's visits: four at once; three for Dr.
23  Riddleberger and one for Dr Courtney. They were full
24  of false statements and inaccurate information.
25
26                          - over-

1  (#65)   By February of 2021 I was told by the office of
2  Pamela Courtney, DO that they would no longer write
3  any prescriptions without a visit. I had no interest in
4  seeing her again so again I called MaineCare and
5  asked for a new doctor. They told me that every doctor
6  in the Portland area was affiliated with Mercy, Maine
7  Medical Center or Martin's Point. Against my better
8  judgment, I let them give me an appointment at
9  Maine Medical Partners. Again I must add that they
10  were aware that I was preparing this claim, yet I
11  felt that everyone could act professionally and treat
12  each other respectfully.
13      On 4/26/21 I had an appointment with Dr.
14  Katie Szanton. Just a few minutes into the meeting
15  she said she wanted me to take a psychiatric evaluation
16  I soon felt uncomfortable with it as I was in a mask
17  and struggling to breathe in a very small room (I have
18  asthma). When I asked her to end it she began trying
19  to put me on psychiatric medications. She kept asking
20  me "what do you like"? I felt this was strange. I went
21  through several medications that I knew of and she
22  kept saying no. When I got to Prozac she lit up. She said
23  "you mean Fluoxetine?", I said "yes, but I'm allergic to
24  gel caps." She told me she would call the pharmacy and
25  talk to them. I told he "NO, I don't want any. She
26                     —over—

1   seemed to deflate. I knew then that she was aware
2   of an incident in 2012. I went to a physician at
3   Opportunity Alliance named Karen Olson. Though I
4   told Dr. Olson that I was allergic to gel caps she told
5   me, "well that's what I'm giving you", and wrote me
6   a prescription for Fluoxetine. I did not use it much
7   because it made my breathing difficult, but in
8   November of 2012 I had an appointment at General
9   Assistance which I knew would be stressful and I
10  took a pill. On that meeting the caseworker told me
11  that she was kicking me out of the program, she became
12  irate slamming her hand on the desk. When I left GA
13  I had another appointment: with Dr. Olson.
14        When I got to Dr. Olson's office I began to
15  go into an intense asthma attack. I was taken
16  to her office where I picked up the phone to call
17  for help. She snatched it from me and made a call. She
18  was terrified. She dialed a number and told the person
19  on the other end, "He's here right now" "He can't breathe"
20  She then hung up and kept shouting, "It wasn't me,
21  I didn't do it." She would not call an ambulance. I
22  could not. Several months earlier, at the Big Apple
23  store, I was told by an officer that if I called 911
24  again I would be arrested (incident described in
25  (#39).
26                          — over

1    It seemed that Dr. Szanton knew about this
2  incident and tried to get me to accept this
3  prescription in order to mitigate Dr. Olson's actions
4
5  (#66) Finally, I called DHHS (MaineCare) and told
6  them that I would have to seek health care
7  outside of Portland for legal reasons. They gave
8  me a number for St. Mary's. When I called on
9  July 27, 2021 the gave me an appointment two
10  months away on September 27, 2021. That, in effect
11  made me go back to Portland emergency rooms for
12  meds.
13      On September 27 I got a call at 7:27 a.m. as
14  I was about to get a ride to St. Mary's. I checked
15  my phone and the message said that the doctor,
16  Carly Laverrierre would not be in. She cancelled
17  at the last minute. I needed medications so I had
18  to, again, go to Mercy Hospital. They then gave me an
19  appointment for October 4, 2021 (St. Mary's).
20      On October 4th I went to St. Mary's and met
21  Carly Laverrierre. She was nasty and abrasive and
22  made several references to my visit to Maine Medical
23  Partners. When I left she told me that she would
24  not write my prescriptions for three months which
25  is a requirement for MaineCare. I asked for a
26                           —over—

1  summary so I could at least make sure that all
2  of my prescriptions were written up. She told me
3  she would mail it.
4       When I got back home I found out that I
5  could not get any medications because she only
6  wrote them for one month. When I tried to get
7  the City of Portland to pay with vouchers I was
8  told that the most important medication could not
9  be dispensed because she didn't write the correct
10 dosage.
11      Later the hospital told me, "we don't know why
12 she did that. We don't do that here." A different
13 doctor then wrote my scripts. I tried to get another
14 physician at that location: I could not. I tried to
15 report the incident: I could not. I would cancel a
16 later appointment with Dr. Laverriere because I had
17 been told, at first, that they would give me someone
18 else.
19      I am currently trying to find a physician who will
20 treat me respectfully and professionally.
21
22 (#67)  During my time in Maine, from 3/10/10 until
23 now, I've had many disturbing incidents happen to
24 me most of which occurred through the process of
25 trying to procure medical care. One person in
26                              —over—

1 particular seemed to be involved in several of these:
2 Joseph R. Rolland PA-C.
3     On July 4th, 2012 in the incident described in
4 (#39) at the Big Apple store, I was denied access to
5 an ambulance ride, but, instead of going to Mercy
6 Hospital's Emergency Department; I took the longer
7 walk to Maine Medical Center. I did this because of
8 the poor treatment I had received constantly through
9 Mercy as opposed to few at Maine Medical Center at
10 that time. When I arrived I was being treated by
11 an intern (I believe), when in walks a doctor who
12 I had been treated by at Mercy. At that time I did
13 not know his name but I soon became familiar with
14 Joseph Rolland.
15     When he came in I was complaining of back
16 pain (he had treated me for my toe injury). He began
17 giving me things to do such as twisting this way,
18 and that; and suddenly he told me to hop up and
19 down on my left foot then right foot. I stopped,
20 looked at them and said "I can't do that". They both
21 started laughing. He then told me that he could
22 not take X-rays for two reasons: one, he didn't
23 want to expose me to all of that radiation, and, two
24 he didn't want to because it would cost too much.
25 When I asked to be transferred to a different facilit
26             —over—

1  they took me in for X-rays, I never heard anything
2  about those X-rays.
3      On May 25, 2016; I made my way to Mercy E.R.
4  in extreme pain due to the recurring problem with
5  my right great toe: I had the initial operation on
6  July 8, 2010 (#21), and another short procedure to
7  fix the problems on June 22, 2014. When I arrived
8  I was left in the waiting room for an extended
9  period and then was put in an observation room for
10 another extended period. Finally Joseph Rolland PAC
11 walks by, he doesn't stop he just motioned for my
12 to follow him. He took me back out to the waiting
13 area and left. When he returned he handed me some
14 discharge paperwork to sign myself out of the E.R.
15 without being seen! I refused to sign the papers so
16 he asked for them back. I told him no. He then offered
17 to take me in for observation, again I declined. I
18 then left and limped to Maine Medical Center.
19      On May 25, 2016 at Maine Medical Center I had
20 the third procedure on my right great toe. It was
21 excrutiating. That procedure was performed by Meghan
22 McNally. My blood pressure on that date was 170/102.
23      On May 22, 2017, I had a meeting with Mercy
24 CEO Charles Therrien about the care I had been getting
25 at his facility. During that meeting I discussed the
26                    —over—

1 situation with Joseph Rolland. I asked at that time
2 that I not be seen by him if I had a hospital visit. I
3 had several visits to the emergency room afterwards and
4 would always ask upon arrival that I not be seen by
5 Joseph Rolland. On 2/17/18 while in an observation
6 room at Mercy I told the physician's assistant that I
7 did not want to be seen by Mr. Rolland. She asked if
8 I would like to speak with him, I said NO. Joseph
9 Rolland then came and "treated" me from outside of
10 the room through that physicians assistance it was
11 not only bizarre, but disrespectful and done in a poor
12 attempt to mitigate his past behavior.
13
14 (#68)  Similarly, throughout most of my time in
15 Maine I've had to rely on the General Assistance
16 program for support; And also during this time I've
17 had a similar situation with Tammy Morse. Though
18 Ms. Morse was not supposed to be handling my case
19 after I met with Doug Gardner at City Hall (#28),
20 she would be assigned to me whenever I made any
21 attempt to adjudicate my legal issues.
22          In the summer of 2011, I sent an E-mail to the
23 Delaware County Republican Party Headquarters in whic
24 I detailed the fraud and abuse at Chester Water
25 Authority. That E-mail was sent from the Portland Public
26                              —over

1  Library. The next day I went back and found that my
2  Yahoo account had been hacked and was now inaccessible
3      In November of 2011 I went home to Pennsylvania both
4  to visit and to again try to adjudicate my case against
5  Chester Water Authority. I visited several National
6  Employment Lawyers Association (NELA) members and
7  also went to the EEOC to pick up an application to
8  file again. I soon returned to Maine, where I would
9  fill out the application and mail it to the EEOC.
10     At the YMCA I entered my room one day and saw
11 a large manila envelope amongst my things. When I
12 opened it, it was an "invitation" to go to the Office
13 of Disability Adjudication and Review (ODAR). I
14 ignored it. I knew at this point that nothing good wa
15 going on in Maine. How did it get in my room? I had
16 been denied when I first came to Maine. Why was it
17 not put in my mailbox? Probably because that would
18 have violated the law.
19     After a few weeks I went to GA to find that I
20 was paired with Tammy Morse. She asked if I had
21 gone to the people at Social Security. I said no. She
22 said "those people want to see you." How did she know?
23 I felt coerced, so I made an appointment.
24
25
26                        —over

1  (#69)   After the visit to Pennsylvania I decided to
2  call a former co-worker, Ms. Estee Dukes of Chester
3  Water Authority because after I sent the e-mail to
4  the Delaware County Republican Party Headquarters
5  I felt that something would stir but hadn't heard
6  anything. Ms Dukes told me that Robyn Bennett was
7  no longer employed by CWA; she had been fired for
8  insurance fraud which was what I had said in the
9  e-mail. She advised me to call her replacement who
10 was Carolyn Joyner.
11        When I called Ms. Joyner she began yelling
12 saying that she had just got there! When I called
13 a couple of weeks later I was told to write a
14 letter to CWA saying that I would not sue! I
15 never did that, I would never be extorted after
16 all I'd been through. I'd rather fight on.
17
18 (#70)  The day following the call to Ms. Dukes I
19 got a call from Robyn Bennett. I don't know how
20 she got my number, but she soon began to
21 threaten me; telling me that I could not sue
22 because "you're up there committing crimes. I
23 don't know what crimes she was speaking of but
24 she sounded desperate. She herself may have been
25 facing charges over her work at CWA.
26                    ─ over

1 (#71) In 2014 I made another trip to Pennsylvania
2 in order to visit and to again seek justice through
3 adjudication at the EEOC concerning CWA. I went to
4 the EEOC and picked up filing forms; I then filled
5 them out and went to see a NELA attorney at 302
6 W. State St in Media, PA. I left a copy.

7      On February 24, 2014 I went to the EEOC to
8 file. A woman came into the waiting area and asked
9 for all of the written forms. My form was "collected".
10 When I asked the woman her name, after a very long
11 pause, she told me Joan Gmitter. I had spoken to her
12 many times over the phone (#13, 5, 6) but had never
13 met her in person. She and Ms. Diana Schley who had
14 taken my complaint in 2007 were central to the one
15 that she just took. I knew she had just done wrong
16 but who could I speak to? She was a supervisor! I
17 left feeling shaken and depressed. From there I went
18 to the U.S. Attorney's Office to again report the
19 insurance fraud at CWA. Nothing!
20
21 (#72) When I got back to the YMCA from my trip
22 to Philadelphia, there was a staffmember coming
23 out of the room next door. He told me, "we're getting rid
24 of him." He was speaking of John McConnell who
25 had called me 'nigger' for years.
26                    — over —

1  Harm to plaintiff and others

2

3  (#73) Defendants in two states, in two separate and

4  distinct fraud enterprises have committed multiple

5  civil and constitutional rights violations; through

6  a pattern of racketeering activity, which have

7  impacted many unsuspecting citizens including

8  plaintiff Sullivan and the class of individuals he

9  seeks to represent. As a result, plaintiff and others

10  similarly situated including dozens in Pennsylvania

11  and hundreds, if not thousands in Maine, have

12  suffered damages.

13

14  Class Action Allegations

15

16  (#74)  Pursuant to Rule 23 of the Federal Rules of

17  Procedure, plaintiff, on behalf of himself and all

18  others similarly situated, seeks to certify two

19  separate Classes defined as follows:

20    1) all persons who were employed by CWA

21  between March 1, 1999 until present and are either

22  of African-American descent or disabled and were

23  in turn, affected by defendant's abusive and

24  fraudulent medical and insurance practices

25  (hereinafter Pennsylvania Class Members), 1

26                    —over

1    The identities of individual Pennsylvania Class
2  Members are ascertainable through, among other
3  things defendants internal records. Members of
4  the Pennsylvania Class may be notified of the
5  pendency of the Class Action by numerous reasonable
6  means, including mail, e-mail, internet, publication
7  and other means; and
8       2) all persons in the State of Maine who are
9  of African-American descent (or African), or have
10 a disability; and have experienced discrimination
11 through Title VII, Title VI, the Americans with
12 Disabilities Act or discrimination in housing
13 between March 1, 2010 and present (hereinafter
14 the Maine Class Members).
15    The identities of individual Members of the
16 Class are ascertainable through, among other things
17 DHHS records, social services records, General
18 Assistance records, etc. Members of the Class may
19 be notified of the pendency of the Class Action by
20 numerous reasonable means, including mail, e-mail
21 internet, publication and other means.
22
23 (#75)  Plaintiff Sullivan over the period of 23 years
24 beginning in March of 1999 and lasting to the
25 present, has run afoul of two fraud enterprises.
26                    _over_

1  These enterprises shall be known hereinafter as the
2  Pennsylvania Fraud Enterprise and the Maine Fraud
3  Enterprise.
4
5  I. THE PENNSYLVANIA FRAUD ENTERPRISE
6
7  (#76)  Section 1961(4) of RICO defines an "enterprise"
8  as "any individual, partnership, corporation, association
9  or other legal entity, and any union or group of
10  individuals associated in fact although not a legal
11  entity."
12
13  (#77)   The following "persons", as defined in 18 USC §
14  1961(3), have been members and constitute an
15  "enterprise" within the meaning of RICO, which are
16  referred to herein collectively as the Pennsylvania
17  Fraud Enterprise; an associate-in-fact enterprise.
18     a) Defendant Chester Water Authority (CWA);
19     b) the physicians, hospitals and clinics to whom
20  CWA sent its employees.;
21     c) the International Brotherhood of Firemen and
22  Oilers SEIU Local 473;
23     d) Judge Dominic F. Pileggi (former Chester Mayor,
24  former Pennsylvania State Senator);
25     e) the Philadelphia Office of the EEOC.,
26                    —over

1    f) Holsten and Associates of Media, PA;

2    g) Mark Alan Raith of Holsten and Associates of Media,

3    PA.

4

5    (#78) Defendants through a pattern of racketeering

6    activity disallowed African-American employees of

7    Chester Water Authority access to proper medical care

8    This access, however, was afford to white employees.

9      African-American employees were refused

10    representation by the union and were also stifled

11    by the EEOC. When Plaintiff Sullivan finally prevailed

12    and went through mediation; upon failure to come

13    to terms with CWA, the EEOC refuse to enforce their

14    powers.

15      The company's insurance company, Holsten

16    and Associates of Media, PA, for their part, refused to

17    settle in a timely manner— through their agent Mark

18    Alan Raith.

19

20    (#79) The predicate offenses required under 18 USC

21    1962(c) (RICO) have already been established by

22    the EEOC itself when it found "just cause" in

23    2007 for Charge #530-2008-00072; for racial

24    discrimination, violations of ADA and retaliation.

25

26             —over

1     As for Causes of Action, plaintiff complains more

2 specifically upon U.S. Code, common law, and the

3 Constitution of the United States of the defendants':

4     1 Conspiracy to violate and violations of

5     a) 18 USC 1961 - 1968 (a);

6     b) Denial of Due Process

7     c) obstruction of justice

8     d) violation of rights under color of law

9     e) fraudulent concealment

10    2. 42 USC 1981

11    3. 42 USC 1983

12    4. Violation of Title VII of the Civil Rights Act

13    5. Violation of Titles I and II of the CRA

14

15 The goal of the Pennsylvania Fraud Enterprise

16

17 (#80)   The ratio of Black and white employees that

18 worked in the departments that plaintiff worked

19 in at CWA was split 50/50. Therefore, if half of the

20 employees (African-Americans) could be denied health

21 and insurance benefits; that would be quite a bit

22 of fraud.

23     The company, it's doctors, and the union

24 conspired to subjugate and harass African-American

25 employees to fulfill that goal

26          —over

## MAINE FRAUD ENTERPRISE

(#81) The following "persons", as defined in 18 USC. §
1961(3) have been members and constitute an "enterprise"
within the meaning of (RICO), are referred to herein.
collectively as the Maine Fraud Enterprise; an associat
in-fact enterprise;

    a) City of Portland, ME;

    b) Mercy Hospital;

    c) Maine Medical Center;

    d) General Assistance program;

    e) YMCA of Portland, ME;

    f) all listed Maine defendants;

    g) Judith Ann Sullivan of Tempe, AZ

(#82) Defendants through a pattern of racketeering
deprived plaintiff of the right to receive medical
care in a proper fashion; the right to accomodations,
and many of his civil and constitutional rights. When
plaintiff wrote letters to Mercy Hospital in his first
month in Maine, hospital CEO Eileen Skinner failed
to make record of the complaint in order to hide the
predicate offense. There were three denials of care at
Mercy Hospital from March 13, 2010 to November
1, 2010. Then it really got bad.

the predicate offense and denial of benefits at the General Assistance office including theft of voucher money was extensive and is ongoing.

Defendants use constant harassment, stalking and intimidation in order to subjugate those who are out of favor.

Plaintiff complains more specifically upon U.S. Code, common law, and the Constitution of the United States, of the defendants:

1) Conspiracy to violate, and violations of

a) 18 USC 1961–1968(a);

b) obstruction of justice by Portland Police Departme

c) denial of due process;

d) fraudulent concealment

e) use of mail in aid of racketeering

2) CFR § 11.406(a)(3) criminal coercion

3) 42 USC 1981 right to sue

4) 42 USC 1983 right to sue gov't agencies

5) Violation of Titles I and II of ADA

6) Violation of Titles VI, VII and VIII CRA

VIOLATIONS OF MAINE STATE LAW

Title 17-A § 905-C Theft of welfare benefits

Title 22 4450: ch. 13 concerning "back bills"

Title 17-A 353(1)(A) unlawful transfer of property

Title 17-A 355(1)(2)(A+B) theft

—over

5 MRSA 4582 unlawful discrimination in housing; and
Defamation by Governor Paul Le Page.

Goal of the Maine Fraud Enterprise

(#83) The goal of the enterprise was to fraudulently
take money and resources, or deny benefits and
accomodations to minorities, the homeless and those
without resources to fight back. If someone chose to
file charges against defendants the charges would
be swift squashed by denial of due process, or the
complainants information would be disseminated and
that person would not be able to gain legal assistance